[No. 6752.]

## RICHARDSON ET AL. v. EL PASO CONSOLIDATED GOLD MINING COMPANY.

1.  CONSTITUTIONAL LAW—*Police Power*—A statute requiring that "all abandoned mine shafts, pits, or other excavations, endangering the life of man or beast, shall be securely covered or fenced" (Rev. State. sec. 4297) is a legitimate exercise of the police power—(446).

2.  STATUTES—*Construed*—A statute requiring that "all abandoned mine shafts, pits and other excavations endangering the life of man or beast shall be securely covered or fenced," is not so uncertain in its terms as to be incapable of enforcement.  The owner of the mining claim having excavated the shaft is under duty to enclose it—(447).

And the statute extends not merely to such workings as are abandoned, in the sense that no intention to return to it or use it in the future, is entertained, but to those workings

which are not in use for the operation of the mine from the surface—(447).

And it applies as well to workings abandoned prior to its enactment, as to those subsequently abandoned—(448).

It was intended to afford protection to the public generally, and extends even to the child of a mere licensee of the owner who resides upon the mining claim on which the shaft is situated—(447, 448).

And the statute requires, not merely that such a shaft shall be covered at the time of quitting it, but that reasonable care be exercised thereafter to maintain the cover or enclosure in reasonably safe condition—(450).

3. NEGLIGENCE—*Reasonable Care*, is that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances, taking into account the dangers which are to be reasonably apprehended—(449).

4. ——*Violation of Statute*—The failure to perform a duty imposed by statute for the protection of the public is negligence *per se*—(449).

5. ——*When for the Jury*—When the evidence is conflicting or different intelligent minds may honestly draw different conclusions therefrom, the question of negligence or contributory negligence must be left to the jury—(449).

A shaft excavated upon defendant's mining claim was abandoned in 1902, and was then securely covered. It was two hundred feet in depth. In 1904 boards were laid crosswise of those which were put down in 1902, but those so originally laid were not examined. In 1906 an employe was instructed to recover all the shafts of the company, and laid new boards in place of those which were missing. He made no examination of the boards which were in place. No inspection was afterward made to determine whether this servant had complied with the order. New stringers or timbers were never put in. Within a radius of four hundred feet from the shafts were fifteen or sixteen houses occupied by families with children, to the number of about twenty, ranging from two to sixteen years of age. These children often played upon the dump of the shaft, and the superintendent of defendant had notice of this. In July, 1907, the plaintiff's son, a boy of nine years, fell into the shaft and was killed. The evidence tended to show that some of the boards were loose, some were warped and corroded by the dry rot, and that only one of them was sound. The stringers supporting them were so decayed that they would not hold a nail. It only required a slight jar to disturb the boards, and

the child probably jumped or stepped upon a board which broke under him, or upon one which was loose. It was held a case for the jury—(449-452).

6. ——*In the Care of Children*—A parent is required to exercise for the protection of his minor child against known dangers, or dangers which by reasonable care would have been known, that degree of care which reasonably prudent persons would have exercised in the same or like circumstances. A child of nine years was sent by the mother to the close vicinity of an abandoned shaft, one board of the cover of which was loose. The parents had previously sent an older son to repair it, and he had attempted to nail down one of the boards which he found loose. The father shortly afterwards examined the cover and thought it secure. Later the mine owner made some repairs, and there was no evidence that the parents after this had notice that the cover was unsafe. *Held*, that whether the parents were guilty of negligence in the care of the child was a question to be left to the jury—(455).

7. CONTRIBUTORY NEGLIGENCE—*Of Infants*—A minor *non sui juris* is required to exercise only such care as may reasonably be expected from one of his age, experience and intelligence. A child of nine years is presumptively *non sui juris;* but the question is one of fact to be determined by all the circumstances of the case. If there is a fair doubt as to the child's capacity the question should be submitted to the jury—(453, 454).

8. PLEADING — *Certainty* — *Things Implied From Things Averred*—What can be reasonably inferred from the averments of a pleading need not be expressly alleged. Action for the death of a child, by its fall into an abandoned shaft, alleged not to be sufficiently covered as required by the statute. The complaint named as defendant "The El Paso Consolidated Gold Mining Company" and averred that the shaft was situated upon the Australia Lode Mining Claim, in the Cripple Creek Mining District. *Held*, that inasmuch as it was apparent from the corporate name that the defendant was engaged in mining for gold bearing ores, that the word "lode" is well understood to apply to veins of metallic ore, the complaint sufficiently disclosed that the shaft in question was upon a metalliferous mine —(445, 446).

9. EVIDENCE—*Relevancy*—Action by the parent for the death of a minor child by his falling into an abandoned shaft the cover of which was defective. Evidence that the mother has

warned the child not to go upon the cover of the shaft was *held* relevant to the question of whether the parents had been negligent in caring for the child—(455).

*Error to Teller District Court*—HON. W. S. MORRIS. Judge.

Mr. CHARLES C. BUTLER for plaintiffs in error.

Messrs. CHINN & STRICKLER for defendant in error.

Mr. JUSTICE GABBERT delivered the opinion of the court:

On July 2, 1907, Allen Richardson, Jr., a boy of nine years, was killed by falling down a shaft belonging to the El Paso Consolidated Gold Mining Company. His parents brought suit to recover damages based upon the ground that the negligence of the defendant caused the death of their son. At the conclusion of the testimony the defendant moved the court to instruct the jury to return a verdict in its favor for the reasons:

"First: Because the pleadings are not sufficient to support a judgment in favor of the plaintiffs or either of them; and

Second: Because the evidence is not sufficient to authorize a judgment in favor of the plaintiffs, or either of them."

The motion was sustained. and plaintiffs bring the cause here for review on error.

The complaint charged that the shaft in question was abandoned; that it belonged to the defendant; that it negligently failed to securely fence or cover the shaft; that plaintiffs and their children lived within one hundred and ten feet of the shaft; that it was in close proximity to roads and highways extensively used by miners and others in going to and from their work;

and that the ground in the near vicinity of the shaft was used by the children of the neighborhood without any objection on the part of the defendant as a playground, of which fact the defendant had notice and knowledge. It is also alleged that the defendant is a corporation created and existing under the laws of this state, and engaged in mining gold and other precious metals; that the shaft in question was located upon mining property known as the Australia lode mining claim, belonging to the defendant, and situate in the Cripple Creek Mining District.

For answer the defendant admitted the ownership of the shaft, but denied the negligence charged, and pleaded contributory negligence of deceased and his parents. It also denied that the shaft was abandoned, and alleged that long prior to July 2, 1907, it had, at the request and solely for the accommodation of the plaintiffs, and without receiving any compensation therefor, granted them permission to erect and occupy during its will and pleasure, the house wherein plaintiffs were living at the time their son was killed, which house was located on the mining premises of the defendant, about one hundred and ten feet from the shaft; that plaintiffs' placed their house on the premises and commenced to reside therein with full knowledge of the condition of the premises and the shaft; that at no time during the period mentioned did the defendant alter or change the condition of the premises or shaft, and that during the whole of this time the plaintiffs, as well as deceased, were thoroughly familiar with the condition of all the shafts, dumps, excavations and paths in the immediate vicinity of their residence, and of the shaft referred to in their complaint. To these defenses, so far as affirmative, a replication was filed.

The laws of this state require—§ 18, p. 364, Laws 1903; § 4297 Rev. Stats.—"that all abandoned mine shafts, pits, or other excavations endangering the life

of man or beast shall be securely covered or fenced."
What specific questions were urged in support of the
motion for a directed verdict, the record does not
disclose.

On behalf of the defendant it is now contended
that the complaint does not state a cause of action;
that the law upon which the plaintiffs predicate their
rights is unconstitutional; that the section in question
is so indefinite and uncertain as to render it unen-
forceable; that neither deceased nor plaintiffs belong
to the class of persons for whose benefit the law was
enacted; that the evidence does not establish that the
shaft was abandoned; that the law does not apply ex-
cept as to shafts abandoned after it went into effect;
and that plaintiffs were mere licensees whose rights
were not violated by a failure of the defendant to pro-
tect the shaft by suitable covering or fences.

The act in question is entitled "An act to regulate
the construction, equipment and operation of metal-
liferous mines, mills and metallurgical plants, provid-
ing penalties for violations thereof, and repealing all
acts or parts of acts in conflict herewith." Based upon
this title, it is urged that in the absence of an allega-
tion that the shaft was upon a metalliferous mine, the
plaintiffs have not stated a cause of action, within the
provisions of the statute. Conceding that the act only
applies to mines yielding metals, it is apparent from
the complaint that the Australia was of this character.
The name of the defendant indicates that it is engaged
in mining gold ores. The complaint alleges that it is,
and that defendant was the owner of a certain mining
property known as "The Australia Lode Mining Claim,
situate on Beacon hill, in the Cripple Creek Mining
District, County of Teller, State of Colorado." The
statutes of this state on the subject of mining claims
located upon veins speak of them as "lode claims,"
which it is well understood means a mining claim con-

taining a vein of metallic ore; so that the averment that the Australia was a lode mining claim is, in effect, an averment that it is a metalliferous mine. An express averment of a fact is not necessary, when from the complaint such fact can be inferred.

In support of the contention that the statute is unconstitutional, it is urged that the legislature is without authority to require the owner of a mining claim to keep it safe for intruders, and that doing so is, in effect, taking property for the use of another without compensation. Neither of these propositions are applicable to the facts of this case. The legislature has the power, within reasonable limits, to prescribe regulations for the safety of the public. We think the act comes within that authority. Mining claims are not enclosed by fences. Their boundaries are only usually marked by posts, one at each corner, and one at the center of each side line. They are located in the mountains in the vicinity of unoccupied and unenclosed Government lands. They are crossed and re-crossed by miners going to and from their work; by prospectors searching for other mines; in fact, by all classes of persons following their usual vocations in the vicinity where located, including children of tender years. In such circumstances, an open, unprotected shaft is a menace to life and limb. In the night-time or in a storm, persons may fall into it, or children may thoughtlessly approach too near the edge and be precipitated to the bottom. Reasonable provisions requiring an abandoned shaft to be so protected as to prevent such casualties come clearly within the police powers of the commonwealth. The statute is not unconstitutional.—*Platte & Denver C. & M. Co. v. Dowell,* 17 Colo. 376.

The claim that the statute is unenforceable for ambiguity is based upon the assumption that the person upon whom the duty rests to cover or fence an aban-

doned shaft is not designated.  The person upon whom
the duty of complying with the statute devolves is the
person to whom it applies.  The different relations of
parties to the property upon which a shaft is located
might be necessary to consider in determining the per-
son upon whom such duty is imposed.  In the case at
bar, however, there is no difficulty in determining that
party.  The defendant was the owner of the Australia,
and as we understand the record, had excavated the
shaft in question.

It is said the plaintiffs and deceased do not belong
to the class of persons for whose benefit the law was
enacted, because it was only intended to protect per-
sons engaged in operating mines.  The statute is not
susceptible of so narrow a construction.  On the con-
trary, from the very nature of mining claims, and the
dangers to be guarded against from the presence of
unprotected, abandoned mining shafts, it was intended
to afford protection to the public generally.

It is contended that a mine shaft is not abandoned
unless it appears the owner left it without any inten-
tion of again using it, and that the evidence does not
establish such intention on the part of the defendant.
For a long time prior to the time when the boy was
killed, the defendant had not used the shaft.  There is
no evidence tending to prove that it had been aban-
doned according to the legal definition of that word,
in the sense that defendant had ceased to utilize it
with the intention of never using it in the future. This,
however, is not the test.  The intent of a statute is the
law.  The cardinal rule of statutory construction is to
discover and enforce its intent.  In construing a stat-
ute the cause and necessity for it, the object in view,
and the evil which it is intended to remedy should al-
ways be taken into consideration in determining its
intention; consequently,  words  employed should be
given that meaning, when possible, which will result

in effecting the object for which it was enacted. As we have pointed out, an uncovered and unprotected shaft is a menace to life and limb. The purpose of the legislature was to minimize danger from this source by requiring that shafts not used for working through from the surface should be protected in the manner indicated. As applied to the facts of this case, that was the character of shafts which was meant by the expression "abandoned mine shafts."

It is urged that the act, when reasonably construed, only applies to shafts abandoned after it took effect. That construction would but partially remove the danger which the statute was directed against. It cannot be so limited unless words are supplied, or the statute given a construction by implication which its plain meaning does not justify.

The evidence discloses that the father of deceased, with the consent of the defendant company, had constructed a house upon the Australia claim, which he was occupying with his family at the time of the death of his son, and that no charge was made for the use of the ground upon which the house stood, or for any part of the Australia claim. On this state of facts it is contended that plaintiffs, as well as the deceased, were mere licensees, which did not entitle either of them to the use of the dump in the immediate vicinity of the shaft, which was about one hundred and ten feet from the house; that deceased was, therefore, a trespasser when upon the dump, and at the shaft, or, if the license extended to the immediate vicinity of the shaft, which was there when the house was constructed, the defendant violated none of its obligations growing out of the relationship of owner to licensee or trespasser. The proposition is wholly inapplicable. Plaintiffs' action is not based upon the ground of a failure on the part of defendant to fulfill any obliga-

tion which it owed them or the deceased, because they occupied a house on the Australia claim, but upon the failure of the defendant to comply with a statutory requirement the purpose of which was to protect the public from injury, which neglect, they claim, caused the death of their son.

This brings us to a discussion of the vital questions in the case, which are, does the evidence establish as a matter of law, the following propositions:

(1)   That the defendant was not negligent;

(2)   That deceased was guilty of negligence, or that defendant was under no duty to him in the circumstances of this case to keep the shaft covered; and

(3)   That the parents were guilty of negligence which precludes their recovery.

When the questions of negligence or contributory negligence depend upon facts to be determined from conflicting evidence, or from inferences to be drawn from facts and circumstances of that character that different intelligent minds may honestly reach different conclusions, they should be left to the determination of the jury.—*Lord v. Pueblo S. & R. Co.*, 12 Colo. 390; *Empson Packing Co. v. Vaughn*, 27 Colo. 66; *D. & R. G. R. R. Co. v. Spencer, ibid* 313; *City of Denver v. Hyatt*, 28 Colo. 129; *Monarch M. & D. Co. v. DeVoe*, 36 Colo. 270; *Farrier v. Colo. Spgs. R. T. Ry. Co.*, 42 Colo. 331; *Nichols v. C., B. & Q. R. R. Co.*, 44 Colo. 501; *Denver City Tramway Co. v. Wright*, 47 Colo. 366; *Kent Mfg. Co. v. Zimmerman*, 48 Colo. 388.

Bearing in mind this rule, we will consider the questions of negligence and contributory negligence in the order indicated.

The failure to perform a statutory duty imposed by a valid statute under the police power of the state for the protection of the public is negligence *per se*.— *Platte & Denver C. & M. Co. v. Dowell*, 17 Colo. 376.

The party upon whom such duty is imposed must not only exercise reasonable care in the first instance to comply with the requirements of the statute, but must thereafter exercise such care in complying with the statutory requirements.—*Jones v. Flint P. M. R. Co.,* 127 Mich. 198. Reasonable care is that degree of care which an ordinarily prudent person would exercise under similar circumstances, taking into consideration the dangers to be apprehended and guarded against which the statute intended to obviate. The claim upon which the shaft was located belonged to the defendant. It had constructed the shaft about two hundred feet in depth, and had ceased to use it for working from the surface for several years before the boy was killed. It was, therefore, its duty under the statute to exercise reasonable care to securely cover or fence the shaft and keep it in that condition.

The evidence appears to establish that defendant did securely cover the shaft in 1902. The boy was killed in July, 1907. From the evidence he probably jumped or stepped upon a board of the cover which broke, or on the end of one which was loose. Touching the condition of the covering immediately or shortly after his death, there is testimony to the effect that some of the boards were loose; that some were dry-rotted and warped; that none were sound except one, and that although the boards may have been originally nailed, the nails had pulled loose; that the stringers supporting them were so decayed that they would not hold the nails, and that it only required a slight jar to loosen the boards. Within a radius of four hundred feet of the shaft there were fifteen or sixteen houses, occupied by families with children aggregating in number about twenty, ranging from two to sixteen years of age. These children often played upon the dump made by the material taken out in excavating the shaft. There is evidence tending to prove that the superin-

tendent of the company knew this fact, as he frequently passed in the near vicinity of the shaft from the time it was covered down to the date when the boy was killed. After 1904 this employe did not examine the covering personally for the purpose of ascertaining its condition. An employe of the defendant testified that in 1904 he re-covered the shaft by laying boards cross-wise over those that had been put in in 1902 length-wise. He said he did not examine the original boards for the purpose of ascertaining whether they were fastened securely, and that he did not put in any new stringers. Another employe of defendant, who had been instructed to re-cover the shafts of the company, testified that in the summer of 1906 he repaired the covering of the Australia shaft by putting on new boards in place of those missing; that at that time the shaft was practically uncovered; that he did not examine the boards that were in place for the purpose of ascertaining their thickness; did not take any of the old boards up, nor put in new stringers at either end.

Referring to these repairs, the superintendent testified (quoting from the abstract): "Did not instruct him to cover this particular shaft. As a matter of fact, do not know whether he did cover it or do anything with it at all; did not examine it to see whether he did, only in just passing it. In just passing it could see the boards were over the shaft. That was all. Assumed that the men had done their duty. * * *"

Speaking of the manner in which the boards were laid, the witness continued: "As I remember, they laid length-wise of the shaft. * * * From 1904 to 1906 it was covered lengthwise of the shaft. Do not remember ever seeing any cross-boards. They were always lengthwise, as I remember. That was so at all times up to the time the little boy was killed."

It will be observed that the last repairs to the covering of the shaft were made about a year before the boy was killed; that the timber to which the covering was fastened had been in several years, and that after the last repairs no examination was made for the purpose of ascertaining the condition of the cover. Without further comment, we think the evidence on these subjects, in connection with that bearing on the condition of the covering at the time the boy fell into the shaft, and the danger to be anticipated from the presence of families consisting in part of children in the near vicinity, was sufficient to justify the submission to the jury of the question of whether or not the defendant had been guilty of negligence in not exercising reasonable care with respect to keeping the shaft covered, and the trial court should have done so, unless it appears from the testimony bearing on the remaining questions involved that plaintiffs cannot recover.

The deceased was nine years of age. His mother had, directed him to empty some chicken feed into a hole a short distance below the Australia shaft. He had not been gone long when his mother looked out. She says, "Allen did as I told him, took the chicken feed and went to the little hole, went down that way. * * * The next time I saw Allen was when I came back into the kitchen and looked out. He was stooping over, hold of this board. He was at the end farthest away from the house. Just immediately, when I saw him bend over, he stepped forward on the board and went down, and he just called 'Mamma'!"

His brother William, who had also been sent on an errand at the same time, after explaining why he had not seen the deceased all the time after leaving the house, said: "Just as I went past the green-house, saw my brother Allen down there. Saw him stoop over. He was at the Australia then, at the end farthest away from the house. He was stooping over, like this, get-

ting ready to place his hand on the board.   He had his hands over on the board.   Don't know whether he was placing the board or not.   Did not see any board move."

A neighbor woman testified that "At the time of the accident, lived about two hundred feet up the slope of Beacon Hill above this Australia shaft.   Was standing on the back porch stamping some pictures, when I saw Allen and Willie leave the house.   As they got to the far edge of the shaft, they parted, Allen going towards the shaft and Willie going above the greenhouse, and as Allen got to the shaft I looked away, at my picture again, and when I looked again he was stooping over, holding the board, and as I thought, pulling the board over the shaft.   He had hold of the board, then stepped on it, and sprang up and down several times.   He did not jump.   I hollered to Willie, and told him Allen fell down the shaft.    *    *    *

"Q.   Was he pulling the board?   A.   It looked as if he was pulling it over the shaft.   He was pulling towards the west.   He was on the bucket side, or the shaft side.   Right after he pulled the board, he stepped on it and sprang up and down on it.   The board commenced to go down with him, and it was slow in going.   He almost got off, and tripped and went over.   He went head first."

If the deceased had been an adult, this testimony might very well be said to have established such contributory negligence on his part as to preclude a recovery; but persons of tender years are not held to the same degree of care that a mature and experienced person is required to exercise.   Minors, not *prima facie sui juris*, are required to exercise such care to avoid danger as might fairly and reasonably be expected from persons of their age.   This is a question to be determined in each case by the circumstances of that case.   If there is a fair doubt as to the child being of

the age and capacity that in law it should be held responsible for the act contributing to its injury, the question should be submitted to the jury to say, by its verdict; whether this is so or not.—*Pueblo El. St. Ry. Co. v. Sherman,* 25 Colo. 114; *Denver City Tram. Co. v. Nicholas,* 35 Colo. 462; *Dempsey v. Brooklyn Heights Ry. Co.,* 98 App. Div. Rep. (N. Y.) 182; *Price v. Water Co.,* 58 Kan. 551.

The deceased, by reason of his age, was not *prima facie sui juris.* He was only required to give such attention to his surroundings, and care to avoid danger from the condition of the cover, as might fairly be expected from one of his years. The question then presented is, whether or not he was capable of appreciating the danger to which he was exposed in removing a board and attempting to replace it by stepping upon it, or upon a board partially decayed to such a degree that he should be held responsible for these acts. In the circumstances of this case, we think this was a question of fact, to be determined by the jury, and not one of law for the court.

But it is urged that defendant was not under any duty to deceased to keep the shaft covered. In a measure, at least, we have already determined this question to the contrary. Children must be expected to act upon childish instincts and impulses. They thoughtlessly expose themselves to danger. Those who are chargeable with a duty of care and caution towards them must calculate on this, and take precautions accordingly. The Australia was not enclosed. Mining claims rarely are. Artificial conditions created by the owners render the surface of such claims dangerous to those passing over them. People pass over, and children play upon them. To prevent injury to the public, including children, the General Assembly has required abandoned shafts to be covered. This, as we have said, is a valid police regulation, and the failure

of the defendant to perform the duty imposed by stat-
ute renders it liable in this case if the death of the
boy, in a substantial sense, was caused by its failure to
comply with the statute.—*U. P. Ry. Co. v. McDonald,*
152 U. S. 262.

The final question relates to the alleged negligence
of the parents.  On behalf of the defendant it is urged
that they failed in their parental duty to guard their
child from a peril known to them.  It was not negli-
gence to take up their abode in a mining camp, and
upon a mining claim.  The most that can be claimed is,
that plaintiffs were required to exercise that degree
of care and caution to prevent injury to their son
from known dangers, or dangers which, by the exercise
of reasonable care, they could have known existed in
the vicinity of their residence, which reasonably pru-
dent persons would have exercised under similar cir-
cumstances.  The record does not disclose that as a
matter of law they failed to exercise such care.  The
mother had directed her son to empty chicken feed in
a hole in the near vicinity of the shaft.  She had not
sent him to the shaft, neither did his errand compel
him to go there.  He appears to have done so of his
own volition.  At the trial plaintiffs sought to show
that his mother had warned him not to walk on the
covering of the shaft.  At the instance of the defend-
ant, this testimony was refused.  Clearly, if the mother
had warned her son not to walk upon the shaft cover-
ing, it would tend to prove care and caution on her
part.  In 1906 the covering of the shaft was out of
repair, a board being loose.  The parents sent an older
son to repair it.  He said he nailed the board, but that
the stringers were not in a good condition to hold nails.
The father testifies that shortly after his son repaired
the covering, he examined one end of the board, and
it seemed secure.  Not long after this the defendant
claims to have repaired the covering.  The evidence

does not disclose that plaintiffs had any knowledge that the covering was defective after this time. On this state of facts, the question of whether or not the plaintiffs were guilty of contributory negligence which was the proximate cause of the death of their son should have been submitted to the jury.

Several minor propositions have been argued by counsel for plaintiffs, which we do not deem it necessary to consider in detail. They relate to the admission and rejection of testimony. We have considered the three important questions in the case, and testimony tending to prove or disprove the issues bearing on them is competent.

The judgment of the district court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Decision *en banc.*

CHIEF JUSTICE CAMPBELL not participating.