## No. 19,150.

### St. Luke's Hospital v. Industrial Commission of Colorado, et al.

(349 P. [2d] 995)

Decided February 23, 1960.   Rehearing denied March 21, 1960.

Messrs. FAIRFIELD & WOODS, Mr. CHARLES J. BEISE, Mr. GEORGE C. KEELY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. PETER L. DYE, Assistant, for defendant in error Industrial Commission of Colorado.

Mr. EDWARD J. BYRNE, for defendant in error Building Service Employees' International Union, Local No. 105.

Mr. TERRY J. O'NEILL, Amicus Curiae.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

Is a charitable private hospital amenable to the collective bargaining provisions of The Colorado Labor Peace Act? This is the single but very important question which we need to resolve in this case.

The Industrial Commission of the State of Colorado determined that it had jurisdiction to conduct a bargaining unit election and that the employees described constituted an appropriate unit. In certiorari proceedings the district court agreed with the Commission and affirmed its determination. Feeling aggrieved, St. Luke's Hospital seeks a reversal of the judgment.

St. Luke's Hospital is a non-profit corporation organized under the laws of this state. It is organized to provide medical and surgical nursing or other care for sick, infirm, aged, injured or destitute persons; and to

instruct and train suitable persons in the duties of nursing and attending upon sick, infirm, aged, injured or destitute persons; and to furnish the instruction and consolation of religion for those seeking its ministrations. Directing its affairs are the Bishop of the Colorado Episcopal Diocese and ten businessmen representing the community.

Evidence was introduced showing in what manner and to what extent these various corporate purposes had been carried out during the last fiscal year prior to the hearing. The number of those employed by the hospital and those working gratuitously was given. Among those employed were 147 persons whom the union sought to organize; 15 were in the engineering and maintenance department, 59 performed housekeeping duties, 27 worked in the laundry, and 73 were employed in the dietary department.

The Industrial Commission and the Building Service Employees' International Union, Local No. 105, are aligned against the hospital in the latter's efforts to secure a reversal of the judgment. Appearing as amicus curiae is the Colorado Hospital Association; its position parallels that of the hospital. Each side would parry the contention of the other with the same instrument, The Labor Peace Act.

The first section of The Labor Peace Act (C.R.S. '53, 80-5-1) is a declaration of policy. So much of the section as throws light on the immediate problem is quoted:

"The public policy of the state as to employment relations and collective bargaining, in the furtherance of which this article is enacted, is declared to be as follows:

"(1) It recognizes that there are three major interests involved, namely: That of the public, the employee, and the employer. These three interests are to a considerable extent interrelated. It is the policy of the state to protect and promote each of these interests with regard to the situation and to the rights of the others.

"(2) Industrial peace, regular and adequate income

for the employee, and uninterrupted production of goods and services are promotive of all these interests."

Necessary also to a proper resolution of our problem are parts of C.R.S. '53, 80-5-2, having to do with definitions, and we quote:

"When used in this article:

"(1) The term 'person' includes one or more individuals, partnerships, associations, corporations, legal representatives, trustees or receivers.

"(2) The term 'employer' means a person who regularly engages the services of eight or more employees other than persons within the classes expressly exempted under the terms of subsection (3) of this section, and includes any person acting on behalf of any such employer within the scope of his authority, express or implied, but shall not include the state or any political subdivision thereof or any carrier by railroad, express company or sleeping car company subject to the Federal Railway Labor Act, Title 45 U.S.C.A., or any labor organization or anyone acting in behalf of such organization other than when it or he is acting as an employer in fact.

"(3) The term 'employee' shall include any person, other than an independent contractor, domestic servants employed in and about private homes and farm and ranch labor, working for another for hire in the state of Colorado in a non-executive or non-supervisory capacity, and shall not be limited to the employees of a particular employer unless the context clearly indicates otherwise; * * * "

Of importance, too, is the major part of C.R.S. '53, 80-5-11 (2), which is as follows:

"Where, as provided by this article the exercise of the right to strike by the employees of any employer engaged in the state of Colorado in the production, harvesting or initial processing, the latter after leaving the farm, of any farm or dairy product produced in this state would tend to cause the destruction or serious deteriora-

tion of such product, the employees shall give to the commission at least thirty days' notice of their intention to strike, and in the case of employees in all other industries or occupations, at least twenty days' notice of their intention to strike, and the commission shall immediately notify the employer of the receipt of such notice. * * * "

Finally, we should consider C.R.S. '53, 80-5-18, which provides:

"Wherever the application of the provisions of other statutes or laws conflict with the application of the provisions of this article, this article shall prevail, provided that in any situation where the provisions of this article cannot be validly enforced, the provisions of such other statutes or laws shall apply."

In construing the scope and effect of a statute we seek out the intent of the legislature in voting its passage. Perhaps the best guide to intent is the declaration of policy which frequently forms the initial part of an enactment. Declarations of policy stated in labor legislation have been persuasive with the courts in regard to the intended coverage of the acts.

A generally accepted view of the import of such declaration of policy is found in the case of *Roth v. Local Union No. 1460 of Retail Clerks' Union,* 216 Ind. 363, 24 N.E. (2d) 280:

"To ascertain the intent of the legislative body that enacted a statute is the fundamental rule for its judicial construction. When the purpose of an act is expressed in clear and unambiguous terms, this must be accepted as the solemn declaration of the sovereign. The public policy of the state is a matter for the determination of the legislature and not for the courts. The statute here under construction declares that it is the public policy of this state that the individual unorganized worker shall be free to decline to associate with his fellows and that he shall be free from interference, restraint, or coercion on the part of his employer.

The quotation was adopted verbatim in the leading case of *Gazzam v. Building Service Employees International Union,* 29 Wash. (2d) 488, 188 P. (2d) 97, 11 A.L.R. (2d) 1330. Various forms of industry are the subjects of, and subject to, The Labor Peace Act; this appears to be the intent and purpose of the act as set forth in the declaration of policy.

■ Is the operation of a hospital an industrial activity? If not, do the definitions contained in C.R.S. '53, 80-5-2, quoted above, bring the hospital within the language and coverage of The Labor Peace Act? In answering these questions, we are persuaded to follow the decision of the Supreme Judicial Court of Massachusetts in the case of *St. Luke's Hospital v. Labor Relations Commission,* 320 Mass. 467, 70 N.E. (2d) 10, rather than the case of *Utah Labor Relations Board v. Utah Valley Hospital,* 120 Utah 463, 235 P. (2d) 520, 26 A.L.R. (2d) 1012.

The following language from the Massachusetts case has a particular appeal to reason:

"A hospital, like the plaintiff, whose doors are open to those needing medical and surgical treatment for which no charge is made to those unable to pay, and which depends for its support and maintenance upon the fees of patients and gifts and donations and cares for recipients of public welfare sent to it by the city at reduced rates and is conducted in the interests of the general public and strictly as a non-profit organization, is a public charity. [Citing cases.] Such a hospital is not conducting a business or commercial enterprise. It is not engaged in industry and trade. [Citing cases.] The agreed facts show that the sole activity of the plaintiff is the maintenance of its hospital, and the services of its non-professional employees, for whom the union seeks certification as their bargaining agency, are directed to the maintenance of the hospital itself. We need not consider what the relationship of the hospital to industry and trade would be if it were engaged in commercial under-

takings, as the care and letting of realty or the conduct of a mercantile establishment, for the benefit of the hospital and employed persons in such undertakings. [Citing cases.]

"But it is urged by the commission that a hospital comes within the definition of an employer, and is not expressly exempted because the word as defined in section 2 includes 'any person acting in the interest of an employer, directly or indirectly, but shall not include the commonwealth or political subdivision thereof, or any labor organization,' with certain exceptions. It is contended that, specific exceptions having been expressly mentioned, no other exemptions are to be supplied by implication. This contention rests upon a familiar principle of statutory interpretation. [Citing cases.] But the entire chapter in which the definition appears must be construed as a whole, and the question is not whether a hospital is expressly exempted but whether a hospital comes within the sweep of the chapter in the light of its declared underlying and predominant aim and object. [Citing cases.] In passing it might be noted that the express exemption of the Commonwealth and cities and towns might have been inserted to free them from being affected by the chapter because of such operations, commercial in character, as the distribution and sale of water, electricity and gas. An interruption of these services might substantially affect industry and trade.

"It is true that the employees whom the union sought to represent were engaged in various kinds of manual labor, some of which were similar to those performed in hotels; but if the nature of the work itself is similar, the relationship of the work performed in a hospital to industry and trade is different from the relationship that work performed in a hotel bears to industry and trade. [Citing cases.] It is also true that such services were essential to the maintenance of the hospital, and those

rendering the services can hardly be said to be engaged in industry or trade."

An additional and very important reason for holding The Labor Peace Act inapplicable to hospitals derives from the public policy of this state. An employee of a hospital has duties consensual in origin and nature arising from the contract of employment, and he further has duties nonconsensual in origin and nature, dependent nevertheless on a privity connected with, but not based upon, the employment contract. These nonconsensual duties are owing to the patients of the hospital. Thus, an employee of a hospital has dual duties: those which he ought to perform as an employee of the hospital, and those which are owing to the patients.

▮ In the performance of these dual duties the same activities are generally effected. Hence, what is required to be done contractually is required also to be done non-contractually for the patients. And these obligations to the patients are not the moral duties which the "certain priest" and the Levite neglected to perform but which the Good Samaritan undertook. They are legal duties. Thus, the engineers of the hospital could not turn off machinery operating devices used by the hospital to sustain the life of certain patients; there is no question that in so doing they would act in dereliction of their duty.

▮ Employees of a hospital, whether professional or nonprofessional, enjoy an employment status quite unlike most other employment relationships. Hospitals are dealing with persons who are third parties to the employees, and these third parties have by reason of circumstances a particular call on the solicitude of everyone connected with the operation of the hospital. Much of the labors of the hospital involve emergency and crisis; minutes of action may mean the difference between survival and death. To vest any organization with power to imperil efficient operation of such an institution is to give a power which no organization should want, or having it, should exercise.

■ Where, to live or not to live hangs in the balance; where, to enjoy health or not to enjoy health is precariously pendent; where, to be made whole or to perhaps become a permanent cripple depends on minutes; in a word, where the helpless or near helpless — the newborn babe, the halt, the hurt, the sick and the dying — resort to the hospital, the resolution of these alternatives should not be even indirectly in the hands of any group acting in concert. Granting that The Labor Peace Act is restrictive legislation, permitting concerted employee action after certain conditions have been complied with, the policy of this state cannot be said to sanction interference with, or disruption of, the normal and essential operation of a hospital by any concerted action of its employees.

On this score, the right to strike looms up as of particular importance. Although not before us, if it be granted that The Labor Peace Act applies to a hospital and its employees, we necessarily grant its application in all its parts, including the right to strike in compliance with the act. The attendant problems — the picket line and the prospective refusal of others not involved to cross the picket line to take necessary supplies to patients — would follow. Organized action against the hospital would result in organized action against those so unfortunate as to be patients therein at the time of such action.

Even beyond the precincts of a hospital if a person be placed in such a position concerning an ill, afflicted, infirm, or otherwise helpless person that his failure to exercise due care would cause injury to the unfortunate one, the law imposes a duty to act at once with a care commensurate with the circumstances with which both are confronted and to take no affirmative action which might result in endangering the helpless person or in augmenting his unhappy plight. *Depue v. Flateau,* 100 Minn. 299, 111 N.W. 1, 8 L.R.A. N.S. 485; *L. S. Ayres & Co. v. Hicks,* 220 Ind. 86, 40 N.E. (2d) 334; *Union Pac. R.*

*Co. v. Cappier,* 66 Kan. 649, 72 Pac. 281, 69 L.R.A. 513; 2 Torts, Restatement of the Law, §324.

Such becomes the duty of one who volunteers to aid or protect a person rendered helpless through no fault of his own. So much more confirmed then is the duty of the employee of a hospital whose labors in some measure have to do with the ministrations to sick and disabled patients of the institution.

This is not to say that an employee once hired by a hospital must remain so associated with it. There is a right in one "to work for or deal with, or to refuse to work for or deal with, any man or class of men as he sees fit." *Master Builders' Ass'n v. Domascio,* 16 Colo. App. 25, 63 Pac. 782. And generally what one person may lawfully do any number may do. *Idem.*

██ But there are exceptions to this general principle. *Green v. Davies,* 182 N.Y. 499, 75 N.E. 536, 3 Ann. Cas. 310. "There can be no independent tort for conspiracy unless in a situation where mere force of numbers acting in unison or other exceptional circumstances may make a wrong, and to prove a tort on the basis of mere force of numbers it must be shown that there was some peculiar power of coercion possessed by the combination which an individual standing in a similar relation to plaintiff would not have had. However, an organized body of men working together can produce results very different from those which can be produced by an individual without assistance, because of a greater power of coercion on the part of the combination, and may make oppressive and dangerous that which, if it proceeded from a single person, would be otherwise. The result of this greater power of coercion is that what is lawful for an individual is not the test of what is lawful for a combination of individuals. Accordingly in a great many cases the rule is laid down broadly that, while the act of an individual may not give rise to civil liability, yet the same act committed by several acting in concert may be

unlawful and constitute an actionable wrong." 15 C.J.S. 1002.

In this aspect of the case we hold that, if it is necessary to determine the primacy of policies, the public policy of The Labor Peace Act must yield to the public policy that its employees may not in concert take any action detrimental or inimical to the welfare of patients of a hospital.

Applying the law enunciated above to the facts before us compels the conclusion that the judgment must be reversed.

Judgment reversed.

MR. JUSTICE DAY specially concurs.

MR. JUSTICE MOORE and MR. JUSTICE DOYLE dissent.

MR. JUSTICE DAY specially concurring:

In concurring with the majority, I wish specially to point out that the interpretation of the statute here under consideration has given recognition to sound principles and techniques of statutory interpretation.

First, it has long been the rule, formulated as far back as 1584 by Lord Coke, that statutory law should be applied according to the spirit of the legislative body and that the determination of the intention of the legislature remains the principle objective of judicial interpretation. So in approaching the problem the court, through the author of the opinion — faced with a resolution of a full and true interpretation of the statute — had before it four questions: 1. What was the law before the making of the act; 2. what was the mischief for which the law did not provide; 3. what remedy did the legislature appoint to cure the disease, and 4. the true reason of the remedy. And then, as Lord Coke put it, "the office of all the judges is always to make such construction as shall suppress the mischief, advance the remedy, * * * suppress subtle invention and evasions for continuance of

the mischief, * * * add force and life to the cure and remedy, according to the true intent of the makers of the act for the public benefit."

The rule has been reformulated, expanded, restricted, explained, and rephrased, but the application of the law according to the spirit of the legislative body remains the principal objective of judicial interpretation. 2 Sutherland, Statutory Construction, sec. 4501.

Application of these principles leads one to the inescapable conclusion that there was not in 1943, when the Labor Peace Act was adopted, any mischief attendant in the operations of hospitals by the persons charged with that grave responsibility. So when the legislature had before it questions of *industrial peace* and the promotion of the *production of goods and services,* it had not conceived that there should be or would be encompassed in the act an employer such as the plaintiff in error here. It is within the power of the courts to bring within the object, spirit and meaning of a statute a situation which may not be strictly within the letter of the act. *Burke v. Industrial Commission, et al.,* 368 Ill. 554, 15 N.E. (2d) 305, 119 A.L.R. 1152. So also the converse is true that the courts should place outside of the act those who are not intended to be encompassed therein even though broad language may, by liberal interpretation, blanket them.

It is equally a sound technique of statutory interpretation to give force and meaning to the public policy, particularly where it is set forth by the legislature, as a preamble to an act. Public policy retains a place of great importance in the process of statutory interpretation, and the tendency of the courts has always been to favor an interpretation which is consistent with public policy. See 3 Sutherland, Statutory Construction, sec. 5901, and cases cited under footnote 1.

It should not be overlooked that another guide to an answer to the problem presented by this writ of error is the long continued contemporaneous and practical inter-

pretation of the statute by the officers charged with its administration, and by the public. It is to be noted that for seventeen years there was no effort in any direction to apply this act to the situation here at hand.

It is my considered judgment that the broad application of the statute as is urged here would not cure any mischief or foster any advancement in the realm of industrial peace, but to the contrary would create such other mischief as to endanger the health and welfare of the public. That, in my opinion, outweighs the privilege sought by these individuals who are still free to engage in or not, as they see fit, this high calling of caring for the sick and the injured.

Mr. Justice Doyle dissenting:

I respectfully dissent from the views expressed by the majority of the Court. My disagreement is with the majority's interpretation of the Act as being limited to "industrial activity" — a limitation which is not apparent in the Act but which has been actually written in by the majority. I firmly believe that we are not empowered to supply legislative omissions in order to provide standards which the Legislature has not included and thus to change the entire character of the Act.

The question presented is whether the non-professional employees of a hospital — the engineers, housekeepers, laundry workers and dietary workers — are within the terms of the Labor Peace Act, C.R.S. '53, 80-5-1, et seq. This question can only be determined from an analysis of the definitions and exemptions which are included in the Act and not from a chance word or phrase contained in the declaration of policy. Section 80-5-2 broadly describes person and employer. The latter includes:

"A person who regularly engages the services of eight or more employees other than persons within the classes expressly exempted under the terms of sub-section 3."

The exemptions here referred to exclude from the term "employee":

"An independent contractor, domestic servants and ranch labor * * * "

A further exemption encompasses a state or any political sub-division thereof or any carrier by railroad subject to the Federal Railway Labor Act. These definitions broadly bring within the scope of the Act all employers and employees other than those which are expressly exempted. There is no exemption in favor of the charitable corporation and such an association cannot be considered as a sub-division of the state.

The trial judge disposed of this issue correctly and pointed out that this contention was predicated upon the fact that charitable hospitals enjoy a tax exemption. The court then declared:

"Can we say, then, that by reason of the tax exemptions granted by our Constitution to these hospitals and, indeed, to the churches that these religious groups operate, to their orphanages and to their other institutions, that they have become political subdivisions of this State and are part of the government of the State of Colorado, subject to its control and regulation?

"Can it be said that because the United States Government grants a twenty-seven per cent depletion allowance to the oil industry, which is, in fact, a subsidy to that industry, that it has become a political subdivision of the United States Government?

"I think the question posed must answer itself, and that it is clear that charitable hospitals, operated by private organizations, are in no way political subdivisions of the State of Colorado."

The majority opinion relies on the Massachusetts case of *St. Luke's Hospital v. Labor Relations Commission,* 320 Mass. 467, 70 N.E. 2d 10, which case held that a hospital is not engaged in industrial activity. This decision of the Supreme Judicial Court of Massachusetts is not authority here for the simple reason that our statute

includes no such requirement, whereas the Massachusetts statute contains this limitation. This is apparent from the opinion of the Massachusetts Court:

" \* \* \* To come within the ambit of the authority of the commission the selection of a bargaining representative must be connected with and related to industry and trade."

The true basis for the majority opinion, as I view it, is its belief that charitable hospitals ought to be exempted even if they are not. The majority proceeds from this premise to the conclusion that the Legislature intended to exempt this type of activity but failed to do so expressly and under such circumstances an implied exemption ought to be read into the statute. This analysis was frankly disclosed in an intermediate Appellate Court decision of New York, that of *Jewish Hospital of Brooklyn v. Doe*, 252 App. Div. 581, 300 N.Y. Supp. 1111, 119. The Court said:

"We believe it is not open to doubt that the Legislature did not intend the statute to be applicable to such institutions even though it did not expressly exempt them."

A Federal case, that of *National Labor Relations Board v. Central Dispensary & Emergency Hospital*, 145 Fed. (2d) 852 dealt with this subject as it existed prior to the adoption of amendments expressly excluding hospitals. The Court said:

"Respondent argues that the spirit or policy of the Act is such that we should read into it an exemption of charitable hospitals. In the interpretation of its state labor relations act the Pennsylvania court held that even though the words might be broad enough to include a hospital, nevertheless they could not conceive that the legislature intended to apply the act to such institutions. We are unable to follow the reasoning of the Pennsylvania court. We cannot understand what considerations of public policy deprive hospital employees of the privilege granted to the employees of other institutions. The opinions of the Minnesota and the Wisconsin Supreme

Courts, holding that charitable hospitals and their non-professional employees are subject to the labor relations acts of those states, present what seems to us the only tenable view as to the spirit and policy of such statutes."

The Minnesota and Wisconsin opinions which are referred to in the opinion are *Northwestern Hospital of Minneapolis v. Public Building Service Employes' Union,* 208 Minn. 389, 294 N.W. 215; *Wisconsin Employment Relations Board v. Evangelical Deaconess Society of Wisconsin,* 242 Wis. 78, 7 N.W. (2d) 590. Both decisions are fully reasoned and applicable. The Minnesota decision is particularly pertinent because the statutory provisions defining employer and employee are substantially similar to the corresponding provisions of the Colorado Act. It expressly rejects the New York decision referred to above and also a Pennsylvania case, *Western Pennsylvania Hospital v. Lichliter,* 340 Pa. 382, 17th Atl. (2d) 206.

A relatively recent decision, that of *Utah Labor Relations Board v. Utah Valley Hospital,* 120 Utah 463, 235 P. (2d) 520 contains a succinct analysis. It is there said:

"The reasoning of the cases relied upon by the defendants seems to be largely to the effect that it would have been a good idea for the Labor Relations Act to except said charitable hospitals and therefore the courts should imply such an exception.

\* \* \*

"These cases point out that the purpose of the act and the function of the Labor Board is to minimize strikes and strife in labor relations; that for the hospital not to be subject to control would give no assurance that there would be no strike or other labor disturbance. The court in the Wisconsin case just referred to says in substance that the principal purpose of the act is to safeguard the interest of the three groups concerned with labor relations, that is, the public, the employer, and the employee; that instead of promoting strikes the real purpose of the act is to provide new methods of peacefully

settling disputes which may arise and thus prevent strikes, and that there can be no greater hazard to the lives of patients in the hospital under the statute than there was before its enactment. Labor and sweat, hours, wages, and the desire to be important as individuals are much the same whether they exist in a charitable hospital or an industrial plant. There seems to be no reason why the position and rights of workers in a hospital are not just as important to the well being of the whole community as those of any other employees."

The district court in the present case analyzed this problem with care and came up with a valid conclusion. It put the matter very plainly:

"There is no need for the Court to discuss the good or the evil which would come from the exempting of charitable hospitals from unionization under the Labor Peace Act. It is no function of this Court to substitute its judgment for that of the Legislature and to say that the Legislature should have exempted charitable hospitals from the terms of the Labor Peace Act. This Court believes strongly in the principle of separation of powers set down by the founding fathers; it believes that it is the function of the sixty-five representatives and thirty-five senators elected by the people of this State to pass legislation; and it believes that no Court should usurp that power by reading into acts provisions that are not there because the particular Court believes they ought to be there.

"The wording of this statute is clear. All persons who hire eight or more employees, except certain persons enumerated in the statute, are covered by the Act, and the Court feels that it is constrained to so hold. Charitable hospitals, not being exempted by the provisions of the Act, cannot be exempted by judicial legislation."

It is of course proper for the court to ascertain legislative meaning from doubtful or ambiguous language and indeed there may be instances where the inapplicability of the statute is obvious from the spirit and

philosophy of the legislation as it appears from a reading of the statute as a whole. But are we justified in psychoanalysis of the General Assembly in our quest for a legislative intent consistent with our policy notions? I believe that we are not.

I concede that there are good sound reasons of policy for either exempting or treating differently a hospital because of the close relation to the public interest. I can sympathize with the viewpoint of the majority that a serious problem could arise if a strike were to be called. I wish to point out, however, that a determination that the employees here in question are not subject to the terms of the Labor Peace Act does not solve the problem. This is true because it does not mean that these employees cannot organize and bargain collectively, and it does not mean that they cannot threaten to strike or actually strike. What it does mean is that such institutions are deprived of whatever protection the restrictions and procedures afforded by the statute provide against irresponsible and ill considered action by organized employees. Invariably when the court departs from its natural function and seeks to legislate in accordance with its own views as to what the law should be it does not solve the over-all problem, but only serves to avoid the problem's friction momentarily.

In the instant case it is clear beyond doubt that the definition in question includes the employees whose status is here in question. That being so, we should so hold and should leave to the General Assembly that which is properly its function.

MR. JUSTICE MOORE joins in this dissent.

MR. JUSTICE MOORE dissenting.

Article III of the Constitution of the State of Colorado provides that:

"The powers of the government of this State are divided into three distinct departments — the legislative,

executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others * * *"

The legislature by adoption of the Labor Peace Act mentioned specifically the employers and the employees who should be excluded from the coverage of the Act. The Act specifically declares that the employees covered thereby shall be *"any person"* except those excluded by express mention. Hospital employees are not among those excluded from coverage by the legislature.

As I understand the majority opinion it is clear that those judges who concur therein believe that the legislature should have excluded an additional category of "employees" to be exempted from coverage by the Labor Peace Act. By application of individual philosophical notions of what should have been done — but was not done — the opinion proceeds to add by implication this additional category — thereby giving to the statute a meaning consistent with the private notion of the majority as to what the legislation should have contained to begin with. The words used by the legislature are plain; they have a definite meaning. There is no legal basis for injection of additional exclusions "by implication."

The majority opinion as I appraise it amounts to judicial legislation and an exercise of power exclusively belonging to the legislative branch of the government, all of which more forcefully appears in the dissenting opinion of Mr. Justice Doyle, in which I concur.

MR. CHIEF JUSTICE SUTTON, formerly concurring, now dissents:

Originally I was convinced that the intention of our legislature was not to include non-profit organizations within the statute in question. It had earlier seemed to me as if no one had thought of saying one way or the

other as to which classification charitable and non-profit institutions should fall in.

A re-review of the authorities relied upon now demonstrates to me that this is not so.

In *National Labor Relations Board v. Central Dispensary and Emergency Hospital* (1944), 145 Fed. (2d) 852 (certiorari denied (1945) 65 S. Ct. 684), a hospital such as St. Luke's was held to be engaged in "trade" and "commerce" within the terms of the National Labor Relations Act. As a result of that decision the National Labor Relations Act was amended by the Congress to remove such non-profit hospitals from the coverage of that statute. *Utah Labor Relations Bd. v. Utah Valley Hospital* (1951), 120 Utah 463, 235 P. (2d) 520. This disclaimer then placed the matter under state law since the federal preemption was repealed.

In the Utah case the two conflicting lines of decisions now in existence on this problem are analyzed. There it was determined that the Utah Labor Relations Act did apply to this type of fact situation. In view of the danger to patients through possible work stoppages or strikes in attempts to organize labor under the act if held applicable, I reluctantly state that I must concur that our Labor Relations Law applies here. To hold otherwise when the statute is so clear is, in my opinion, to deny the well established rule of law that to include one is to exclude others, and to usurp the functions of an independent branch of government. I now believe the hospital here should have addressed its complaint to the Legislature and not to this court.