No. 19,847.

HARVEY H. HOUSTON, as State Inspector of Oils, *v.*
SYMINGTON WAYNE CORPORATION.
(369 P. [2d] 424)

Decided February 26, 1962.    Rehearing denied March 19, 1962.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E.
HICKEY, Deputy, Mr. GAIL L. IRELAND, Special Assistant,
Mr. CLIFTON A. FLOWERS, Assistant, for plaintiff in error.

Messrs. HOLLAND & HART, Mr. BRUCE T. BUELL, for
defendant in error.

*In Department.*

Opinion by MR. JUSTICE McWILLIAMS.

To blend or not to blend, that is the question.

Stated somewhat differently, the question to be resolved is: Does C.R.S. '53, 100-2-20 prohibit the use of the Blend-O-Matic gasoline pump in Colorado. Harvey H. Houston, acting in his official capacity as State Inspector of Oils of the State of Colorado, answered this question in the affirmative. Whereupon the Symington Wayne Corporation, a Maryland corporation which manufactures the type of gasoline pump here involved, brought the present action seeking a declaratory judgment that C.R.S. '53, 100-2-20 "does not prohibit the installation and use of the Blend-O-Matic pump" or, in the alternative, if the statute does preclude use of this pump, then a declaration that the statute is unconstitutional. In a second claim it sought an order setting aside Houston's "decision prohibiting the installation and use of Blend-O-Matic" and a further order directing Houston "to inspect for accuracy all Blend-O-Matic pumps as and when the same may be installed and, if found to be correct, seal the same as correct and cause said sealing to be approved by himself or one of his deputies."

Upon trial the learned trial judge held that Blend-O-Matic did not operate in violation of C.R.S. '53, 100-2-20 and entered judgment to that effect. It was further decreed that Houston could not refuse to approve Blend-O-Matic on the basis of C.R.S. '53, 100-2-20, and that his approval of this pump should be granted if Blend-O-Matic met the other statutory requirements pertaining to the installation and use of gasoline pumps. Motion for new trial was dispensed with, whereupon Houston filed in this Court his "Application for Supersedeas and Final Determination." Symington Wayne Corporation consents to a final determination of this matter upon Houston's application for supersedeas, and we shall so do.

The purpose of the Blend-O-Matic gasoline pump is to permit motorists, if they choose, to purchase gasoline which is "part" premium and "part" regular, the pro-

portion of each to be determined by the customer. From the record it is learned that the Blend-O-Matic pump operates in the following manner. Under each Blend-O-Matic pump are two storage tanks, one of which is for premium gas and the other for regular gas. From each tank is a rubber hose which goes up through the pump and into the nozzle where there is an automatic "mixing" or "blending" of the gasoline drawn from the two tanks, which mixture is then discharged into the customer's gas tank. The amount of flow from each tank is regulated by a selector knob located on the side of the pump to the end that the pump is mechanically capable of delivering seven different blends of premium and regular gas, the graduations being in progressions of $12\frac{1}{2}\%$. A customer can purchase "straight" premium or "straight" regular from a Blend-O-Matic pump, but in addition he may select any of the following blends of premium and regular gas:

| BLEND | | | REGULAR | | PREMIUM |
|-------|---|---|---------|---|---------|
| #1: | consisting of | | $87\frac{1}{2}\%$ | and | $12\frac{1}{2}\%$ |
| #2: | " | " | $75\%$ | " | $25\%$ |
| #3: | " | " | $62\frac{1}{2}\%$ | " | $37\frac{1}{2}\%$ |
| #4: | " | " | $50\%$ | " | $50\%$ |
| #5: | " | " | $37\frac{1}{2}\%$ | " | $62\frac{1}{2}\%$ |
| #6: | " | " | $25\%$ | " | $75\%$ |
| #7: | " | " | $12\frac{1}{2}\%$ | " | $87\frac{1}{2}\%$ |

On the front of the tank appears the cost per gallon for each of these seven blends, and, as was mentioned above, by pushing a selector knob located on the side of the pump any one of the seven blends may be instantaneously delivered to the customer's tank. The total number of gallons purchased as well as the total cost thereof also appears on the pump in the same manner as on the typical gasoline pump presently in use in Colorado.

The underlying reason for the manufacture of this particular type of a gasoline pump is the belief that

there is customer demand for gasoline which is neither "straight" premium nor regular, but is rather a blend of the two. It is said that each individual automobile engine has its own individual fuel requirements, and that this pump is designed to help meet this need.

Houston declined to "approve" the Blend-O-Matic pump solely on the ground that in his opinion C.R.S. '53, 100-2-20 precluded its use in Colorado. C.R.S. '53, 100-2-20 was enacted by the General Assembly in 1931 and reads as follows:

"Trade names — unlawful use. — It shall be unlawful for any person, firm, or corporation, to expose for sale, offer for sale, or sell, under any trade mark or trade name in general use, any liquid fuels, lubricating oils, or other like products, except those manufactured or distributed by the manufacturer or distributor marketing liquid fuels, lubricating oils, or other like products, under such trade mark or trade names, *or to substitute, mix, or adulterate, the liquid fuels, lubricating oils, or other similar products, sold, offered for sale, or distributed, under such trade mark or trade name.*" (Emphasis supplied.)

It is Houston's contention that Blend-O-Matic's method of operation is in direct violation of the italicized portion of the foregoing statute in that Blend-O-Matic does "mix" a liquid fuel sold under a trade mark or trade name.

Our attention has not been directed to any decision of this or any other court dealing with the interpretation to be given this type of a regulatory statute as it applies to the installation and operation of a gasoline pump. It does appear that Blend-O-Matic has been approved in every state except Colorado, and that certain of these states do have a statute virtually identical with ours. However, the "approval" in each instance was in the form of an opinion from the Attorney General. Accordingly, without the benefit of judicial precedent, we shall proceed to a consideration of C.R.S. '53, 100-2-20.

In construing a statute the cardinal rule universally followed is that the judiciary should attempt to determine the intent of the legislative body in an effort to arrive at the true meaning of the statute under consideration. As Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Commissioner of Internal Revenue,* 159 Fed. (2d) 167, so aptly said:

"There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis's maw that one is in danger of being impaled upon Scylla's rocks."

To a like effect, this Court in *Richardson v. El Paso Consolidated Gold Mining Company,* 51 Colo. 440, 118 Pac. 982 said:

"The intent of a statute is the law. The cardinal rule of statutory construction is to discover and enforce its intent. In construing a statute the cause and necessity for it, the object in view, and the evil which it is intended to remedy should always be taken into consideration in determining its intention; consequently, words employed should be given that meaning when possible, which will result in effecting the object for which it was enacted." See also, *St. Luke's Hospital v. Industrial Commission of Colorado,* 142 Colo. 28, 349 P. (2d) 995.

The intent of the General Assembly which in 1931 enacted into law that which is now referred to as C.R.S. '53, 100-2-20 is contained in the Original Act itself, where the Assembly in so many words declared that its intent

was "* * * to promote the public health and safety and to avoid perpetration of fraud upon users and purchasers * * *" It is quite obvious that the evil aimed at by the legislature was the deception of a customer by a retailer of gasoline fuels who offered for public sale a trade named product which was something other than what it was held out to be. Houston does not contend that one who buys gas from a Blend-O-Matic pump is in anywise deceived, nor does he question the accuracy of the pump and its operation. Rather Houston's sole contention is that C.R.S. '53, 100-2-20 prohibits the mixing of trade named products, and that Blend-O-Matic does just that. If such a literal interpretation is to be given the statute, then a retailer who puts premium gas into a customer's tank which contains a residuum of regular gas is also violating the law, and similarly the retailer could not lawfully sell to one customer five gallons of premium and five gallons of regular gas to be placed in the same tank.

Fortunately, such a rigid, literal interpretation of this statute is unnecessary. It is really quite clear that the intent of the statute is to make certain that a retailer of gasoline fuels who offers for sale a trade named product has not in any manner diluted or adulterated it and that the trade named article is exactly what it is held out to be, nothing more, nothing less. To accomplish this end the statute in effect declares that no foreign liquid should be substituted for, or mixed with, the trade name product, but the statute does not preclude one trade named product, which is exactly what it purports to be, from being blended with another trade name product, which is also what is is held out to be. In other words, as C.R.S. '53, 100-2-20 applies to Blend-O-Matic, it is unlawful to have anything except premium gasoline in the premium storage tank, or anything except regular gasoline in the regular storage tank. If this be done, the intent of the legislature and true meaning of

the statute have been met, and it is not thereafter unlawful to sell the customer the blend of premium and regular gas that he desires.

The judgment is affirmed.

MR. JUSTICE HALL and MR. JUSTICE PRINGLE concur.