ORLANDO DEPUE v. JOHN FLATAU and Another.[1]

March 15, 1907.

Nos. 14,930—(128).

**Negligence.**

Whenever a person is placed in such a position with regard to another that it is obvious that if he does not use due care in his own conduct he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself to avoid such injury; and a negligent failure to perform that duty renders him liable in damages.

**Same—Person in Suffering.**

The rule is more exacting respecting persons suffering from sickness or physical infirmities.

[1] Reported in 111 N. W. 1.

**Evidence—Question for Jury.**

Plaintiff was a cattle buyer, and on January 23, 1905, a very cold day, he called at the farm of defendants at about five o'clock in the evening to inspect some cattle he understood they had for sale. It was dark, and he was unable to inspect the cattle, whereupon he requested permission to remain with defendants overnight, which request was refused. He then bought some furs of members of defendants' family, and defendant Flatau, Sr., invited him to remain for supper. Upon this invitation he entered defendants' home and was given supper with the family. Soon thereafter he was taken violently ill and fell to the floor. From this point his memory is not clear as to what occurred, but he recalls that he again requested permission to remain at defendants' home overnight, and that his request was refused. Defendants then assisted him from the house and into his cutter, and started him on his journey home, seven miles away. He was found next morning, about three-quarters of a mile from defendants' house, nearly frozen to death, having been again attacked by his ailment and fallen from his cutter. He was taken to a nearby farmhouse and revived, and subsequently brought this action against defendants for damages, on the theory that, in view of his physical condition, which was known to defendants, they were guilty of negligence in sending him out unattended on a cold night to make his way to his home as best he could. It is *held*, within the general principle of law above stated, that, plaintiff not being a trespasser upon the premises of defendants, but there by express invitation, defendants owed him the duty, upon discovering his physical condition, to exercise reasonable care in their own conduct not to expose him to danger by sending him out from their home, and that, if defendants knew and appreciated his physical condition, their conduct amounted to negligence, and the question of their liability should have been submitted to the jury.

Action in the district court for Watonwan county to recover $5,000 for personal injuries. The case was tried before Lorin Cray, J., who, at the conclusion of plaintiff's testimony, dismissed the action. From an order denying a motion for a new trial, plaintiff appealed. Reversed.

*J. E. Haycraft* and *W. S. Hammond,* for appellant.

*Pfau & Pfau, C. J. Laurisch,* and *Edward C. Farmer,* for respondents.

BROWN, J.

The facts in this somewhat unusual case are as follows: Plaintiff was a cattle buyer, and accustomed to drive through the country in

the pursuit of his business, buying cattle, hides, and furs from the farmers. On the evening of January 23, 1905, about five or 5:30 o'clock, after having been out a day or two in the country, he called at the house of defendants, about seven miles from Madelia, where he resided. His object was to inspect some cattle which Flatau, Sr., had for sale, and if arrangements could be made to purchase the same. It was dark at the time of his arrival, but he inspected the cattle in the barn, and suggested to defendant that, being unable to determine their value by reason of the darkness, he was not prepared to make an offer for the cattle, and requested the privilege of remaining overnight, to the end that a bargain might be made understandingly in the morning. His request was not granted. Plaintiff then bought some furs from other members of defendants' family, and Flatau, Sr., invited him to remain for supper. Under this invitation plaintiff entered the house, paid for the furs, and was given supper with the family. After the evening meal, plaintiff and both defendants repaired to the sitting room of the house, and plaintiff made preparation to depart for his home. His team had not been unhitched from the cutter, but was tied to a hitching post near the house. The testimony from this point leaves the facts in some doubt. Plaintiff testified that soon after reaching the sitting room he was taken with a fainting spell and fell to the floor. He remembers very little of what occurred after that, though he does recall that, after fainting, he again requested permission to remain at defendants' overnight, and that his request was refused. Defendants both deny that this request was made, and testified, when called for cross-examination on the trial, that plaintiff put on his overshoes and buffalo coat unaided, and that, while adjusting a shawl about his neck, he stumbled against a partition between the dining room and the sitting room, but that he did not fall to the floor. Defendant Flatau, Jr., assisted him in arranging his shawl, and the evidence tends to show that he conducted him from the house out of doors and assisted him into his cutter, adjusting the robes about him and attending to other details preparatory to starting the team on its journey. Though the evidence is somewhat in doubt as to the cause of plaintiff's condition while in defendants' home, it is clear that he was seriously ill and too weak to take care of himself. He was in this condition when Flatau, Jr., assisted

him into the cutter. He was unable to hold the reins to guide his team, and young Flatau threw them over his shoulders and started the team towards home, going a short distance, as he testified, for the purpose of seeing that the horses took the right road to Madelia. Plaintiff was found early next morning by the roadside, about three-quarters of a mile from defendants' home, nearly frozen to death. He had been taken with another fainting spell soon after leaving defendants' premises, and had fallen from his cutter, where he remained the entire night. He was discovered by a passing farmer, taken to his home, and revived. The result of his experience necessitated the amputation of several of his fingers, and he was otherwise physically injured and his health impaired. Plaintiff thereafter brought this action against defendants, father and son, on the theory that his injuries were occasioned solely by their negligent and wrongful conduct in refusing him accommodations for the night, and, knowing his weak physical condition, or at least having reasonable grounds for knowing it, by reason of which he was unable to care for himself, in sending him out unattended to make his way to Madelia the best he could. At the conclusion of plaintiff's case, the trial court dismissed the action, on the ground that the evidence was insufficient to justify a recovery. Plaintiff appealed from an order denying a new trial.

Two questions are presented for consideration: (1) Whether, under the facts stated, defendants owed any duty to plaintiff which they negligently violated; and (2) whether the evidence is sufficient to take the case to the jury upon the question whether defendants knew, or under the circumstances disclosed ought to have known, of his weak physical condition, and that it would endanger his life to send him home unattended.

The case is an unusual one on its facts, and "all-four" precedents are difficult to find in the books. In fact, after considerable research, we have found no case whose facts are identical with those at bar. It is insisted by defendants that they owed plaintiff no duty to entertain him during the night in question, and were not guilty of any negligent misconduct in refusing him accommodations, or in sending him home under the circumstances disclosed. Reliance is had for support of this contention upon the general rule as stated in note to Union. Pacific v. Cappier, [66 Kan. 649, 72 Pac. 281], 69 L. R. A. 513, where

it is said: "Those duties which are dictated merely by good morals or by humane considerations are not within the domain of the law. Feelings of kindliness and sympathy may move the Good Samaritan to minister to the needs of the sick and wounded at the roadside, but the law imposes no such obligation; and suffering humanity has no legal complaint against those who pass by on the other side. * * * Unless therefore, the relation existing between the sick, helpless, or injured and those who witness their distress is such that the law imposes the duty of providing the necessary relief, there is neither obligation to minister on the one hand, nor cause for legal complaint on the other." This is no doubt a correct statement of the general rule applicable to the Good Samaritan, but it by no means controls a case like that at bar.

The facts of this case bring it within the more comprehensive principle that whenever a person is placed in such a position with regard to another that it is obvious that, if he does not use due care in his own conduct, he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself, and with which he is confronted, to avoid such danger; and a negligent failure to perform the duty renders him liable for the consequences of his neglect. X

This principle applies to varied situations arising from noncontract relations. It protects the trespasser from wanton or wilful injury. It extends to the licensee, and requires the exercise of reasonable care to avoid an unnecessary injury to him. It imposes upon the owner of premises, which he expressly or impliedly invites persons to visit, whether for the transaction of business or otherwise, the obligation to keep the same in reasonably safe condition for use, though it does not embrace those sentimental or social duties often prompting human action. 21 Am. & Eng. Enc. (2d Ed.) 471; Barrows, Neg. 4. Those entering the premises of another by invitation are entitled to a higher degree of care than those who are present by mere sufferance. Barrows, Neg. 304. The rule stated is supported by a long list of authorities, both in England and this country, and is expressed in the familiar maxim, "Sic utere tuo," etc. They will be found collected in the works above cited, and also in 1 Thompson, Neg. (2d Ed.) § 694. It is thus stated in Heaven v. Pender, L. R. 11 Q. B. Div. 503: "The

proposition which these recognized cases suggest, and which is, therefore, to be deduced from them, is that, whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger." It applies with greater strictness to conduct towards persons under disability, and imposes the obligation as a matter of law, not mere sentiment, at least to refrain from any affirmative action that might result in injury to them. A valuable note to Union Pacific v. Cappier, 69 L. R. A. 513, discusses at length the character of the duty and obligation of those coming into relation with sick and disabled persons, and numerous analogous cases are collected and analyzed.

In the case at bar defendants were under no contract obligation to minister to plaintiff in his distress; but humanity demanded that they do so, if they understood and appreciated his condition. And, though those acts which humanity demands are not always legal obligations, the rule to which we have adverted applied to the relation existing between these parties on this occasion and protected plaintiff from acts at their hands that would expose him to personal harm. He was not a trespasser upon their premises, but, on the contrary, was there by the express invitation of Flatau, Sr. He was taken suddenly ill while their guest, and the law, as well as humanity, required that he be not exposed in his helpless condition to the merciless elements.

The case, in its substantial facts, is not unlike that of Cincinnati v. Marrs' Adm'x., 27 Ky. Law 388, 85 S. W. 188, 70 L. R. A. 291. In that case it appears that one Marrs was found asleep in the yards of the railway company in an intoxicated condition. The yard employees discovered him, aroused him from his stupor, and ordered him off the tracks. They knew that he was intoxicated, and that he had left a train recently arrived at the station, and he appeared to them dazed and lost. About forty minutes later, while the yard employees were engaged in switching, they ran over him and killed him. He had again fallen asleep on one of the tracks. The court held the railway company liable; that, under the circumstances disclosed, it was the

duty of the yard employees to see that Marrs was safely out of the yards, or, in default of that, to exercise ordinary care to avoid injuring him; and that it was reasonable to require them to anticipate his probable continued presence in the yards. The case at bar is much stronger, for here plaintiff was not intoxicated, nor a trespasser, but, on the contrary, was in defendants' house as their guest, and was there taken suddenly ill in their presence, and, if his physical condition was known and appreciated, they must have known that to compel him to leave their home unattended would expose him to serious danger.

We understand from the record that the learned trial court held in harmony with the view of the law here expressed, but dismissed the action for the reason, as stated in the memorandum denying a new trial, that there was no evidence that either of the defendants knew, or in the exercise of ordinary care should have known, plaintiff's physical condition, or that allowing him to proceed on his journey would expose him to danger. Of course, to make the act of defendants a violation of their duty in the premises, it should appear that they knew and appreciated his serious condition. The evidence on this feature of the case is not so clear as might be desired, but a majority of the court are of opinion that it is sufficient to charge both defendants with knowledge of plaintiff's condition—at least, that the question should have been submitted to the jury. ʎ

Defendant Flatau, Sr., testified that he was in the room at all times while plaintiff was in the house and observed his demeanor, and, though he denied that plaintiff fell to the floor in a faint or otherwise, yet the fact that plaintiff was seriously ill cannot be questioned. Flatau, Jr., conducted him to his cutter, assisted him in, observed that he was incapable of holding the reins to guide his team, and for that reason threw them over his shoulders. If defendants knew and appreciated his condition, their act in sending him out to make his way to Madelia the best he could was wrongful and rendered them liable in damages. We do not wish to be understood as holding that defendants were under absolute duty to entertain plaintiff during the night. Whether they could conveniently do so does not appear. What they should or could have done in the premises can only be determined from a full view of the evidence disclosing their situation, and their facilities for communicating his condition to his friends, or

100 M.—20

near neighbors, if any there were. All these facts will enable the
jury to determine whether, within the rules of negligence applicable
to the case, defendants neglected any duty they owed plaintiff.

Order reversed.