## TUCKER *v.* BURT.

1. LANDLORD AND TENANT — EXISTENCE OF RELATION — OCCUPATION BY SERVANT.

   The janitor of an apartment building, receiving as compensation for his services a salary and the use of certain rooms in the building for the use of himself and wife, is not the tenant of his employer, and has no right to bring into his employer's house to live with him any one without his employer's assent.

2. TORTS—WHAT CONSTITUTE—VIOLATION OF MORAL OBLIGATION.

   Plaintiff was taken ill with an infectious disease while visiting the janitor in defendant's apartment house, and on learning of the character of the disease defendant ordered her from the flat, accompanying his order with a threat that if it were not executed he would come with an officer and put her out. Unable to hire an ambulance, plaintiff made use of the street cars and by walking reached her own home where she was immediately taken worse. *Held*, that defendant violated no

legal duty to plaintiff, it being as much his duty to look out for his tenants as to look out for her, and there being nothing from which defendant might infer that an aggravation of plaintiff's illness would follow her removal.

Error to Wayne; Mandell, J.   Submitted January 23, 1908.   (Docket No. 135.)   Decided March 31, 1908.

Case by Jennie Tucker against McKinstry Burt for personal injuries.   There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Abbott & Abbott* and *Lehman & Riggs*, for appellant.

*James H. McDonald* and *Lloyd L. Axford*, for appellee.

Defendant was the owner of a six-family apartment building known as the Pontiac Apartments.   It was occupied by six families.   The janitor, plaintiff's son-in-law, Mr. Barber, received as compensation for his services $20 per month and the use of certain rooms in the basement for the use of himself and wife.   Plaintiff was a widow whose youngest son—about 12 years old—lived with her.   She was poor and went out to service.   She was in the habit of leaving her son during the day with her daughter and her husband, calling for him at night when she returned to her own home, about 12 blocks from the Pontiac Apartments.

One day during the latter part of April, 1905, the boy was taken ill with inflammatory rheumatism at his sister's home.   It was arranged that the boy should remain there; that plaintiff should take care of him at night, and that the daughter and her husband would take care of him during the day.   They had but one bed room which was given up to the plaintiff and her son, while the daughter and her husband slept in a bed upon the floor in the sitting room.   One day, but the precise time does not appear, plaintiff was taken ill with erysipelas.   It was

not regarded by the physician as a very serious case. She remained there until May 15th. Meanwhile plaintiff's physician had told the tenants in the building that the disease was infectious and warned them to be careful. He testified that one of the tenants called him up and berated him a little for having her there. On Sunday, the 14th, the defendant, having learned of plaintiff's illness and the infectious character of it, notified the janitor, Mr. Barber, that he must take plaintiff out of the flat. Mr. Barber said he would try and see what he could do about having her removed before Monday afternoon. On the following forenoon defendant called Mr. Barber by telephone and informed him that he must get plaintiff out by noon or he would bring an officer and put them all out. Mr. Barber communicated this message to the plaintiff. He told her that she had better stay. He testified:

"She [plaintiff] got up on her ear, and said she was going. She got very excited, and said she did not want to cause me any trouble, and she would rather go than cause me trouble."

She described the circumstances of her leaving as follows:

"On the 15th day of May, 1905, it was brought to my knowledge, that Mr. Burt desired me to leave and insisted on my leaving. My son-in-law came in and said that Mr. Burt telephoned that I should leave the place, and if I didn't leave in an hour or two hours, if I was not out in that length of time he would come up and put the whole shooting match out of the house. That frightened me because I did not want to cause my son-in-law any trouble, and he said, don't be frightened, and I said I am, because I don't want to cause you trouble, and he said you are not able to go, and I said I will go anyway and put on my things, and took the street car. My daughter accompanied me. Up to that time I had not left the house during my illness at the Pontiac Flat; I had not left the room. I can't tell the time of day. We telephoned for an ambulance, but I could not pay the amount of charges, and I took a street car. I had to walk nearly two blocks. I

went down Beaubien and transferred on a Crosstown, and when I got to Third avenue I walked from the cars."

She also testified that she was taken worse immediately thereafter. She left the apartments for her home about 2 o'clock p. m. Her daughter accompanied her. It took about half an hour to get home. She had forgotten the key to her house, and sat upon the stoop while her daughter climbed into a window and opened the door. There was no fire in the house, but the daughter immediately built one.

She brought this suit charging that—

"She, in common with all the inhabitants of this republic, was entitled to be protected in the enjoyment of her health, her life, and her limbs, her property and all other rights commonly known as the absolute rights of persons, and in her then condition was entitled to be protected against being exposed to the weather, or to such physical or mental effort and fatigue as would have a tendency to bring about a relapse in her condition and an aggravation of her said affliction.

"And the plaintiff further avers that by reason of the premises, it became and was the duty of the said defendant to permit her to enjoy her said absolute rights, and to wholly desist and refrain from requiring, ordering, directing or compelling her to leave her place at said Pontiac Flats, and undergoing the fatigue, physical exertion and mental anxiety incident to leaving her said place at said flat, in her then condition, and going to her said home at 853 Third avenue, in said city. And it was the other and further duty of the said defendant to refrain from any and all acts which would have a tendency to and would bring upon the said plaintiff a relapse, and to permit the plaintiff to remain at her room in said flat until restored to such health that she could return to her own room without danger of a relapse.

"Yet the said defendant, not regarding his said duty or duties, or any or either of them, for the sole reason that some of the tenants in said flat thought that plaintiff's affliction was contagious, the said defendant wrongfully, heartlessly, unlawfully, and in utter disregard of the plaintiff's rights and condition of her health, required, ordered and directed and insisted upon the removal of the said plaintiff from said flats, although it must have been

perfectly apparent to any one that such action would greatly endanger the life and health of the said plaintiff, and the said defendant unlawfully, wrongfully, negligently and recklessly and heartlessly required and ordered the said James Barber to put the said plaintiff out of said flat, and instructed the said Barber that unless he did as directed the said defendant would come there with policemen and officers and remove the said plaintiff from said flat."

Plaintiff introduced evidence tending to show that she was worse after leaving the defendant's premises.

When the plaintiff rested her case the court directed a verdict for the defendant, on the ground (1) that the defendant had violated no duty which he owed to plaintiff, and (2) that there was no evidence that her physical condition after she left was traceable to the alleged wrongdoing on the part of defendant.

GRANT, C. J. (*after stating the facts*). The question here involved is one of legal, not of moral, obligation. The law imposes no duty upon the individual citizen to care for the sick or the unfortunate who are poor. The public in this country assume that obligation, and each citizen has performed all that the law requires of him when he has paid his share of the expense imposed upon him by taxation for that purpose.

The Priest and Levite violated no rule of law when they passed by on the other side of the wounded man. The Good Samaritan was not acting in obedience to a legal duty when he took compassion upon him, took care of him and removed him to the inn. What legal duty, if any, did defendant owe plaintiff? Unless the law imposed the duty upon the defendant to shelter her and her son in his house, it is clear that he cannot be held liable. The janitor, Mr. Barber, was defendant's employé, not his tenant. He possessed none of the rights of a tenant. *School District No. 11 of Alpine Township v. Batsche*, 106 Mich. 330 (29 L. R. A. 576). He had no right to bring into his employer's house to live with him any one, whether well or ill, without his employer's assent. De-

fendant had not invited plaintiff to his house, neither had he authorized his employé to do so.

The disease was infectious and dangerous to the tenants in the house, especially, perhaps, to one woman, who shortly before had given birth to a child. The doctor had notified the tenants of the danger. Defendant was under no obligation to keep the plaintiff in his house if she could be removed without danger of serious injury. He might lawfully request those who were responsible for her being there to cause her removal. He might not, neither did he, turn her into the street. He first requested his employé to cause her removal. When that employé failed, he insisted and threatened to take prompt legal steps with an officer to accomplish it. She was not confined to her bed. There was testimony to show that defendant knew that plaintiff had a house of her own, but none to show that he knew where it was located. Her physician testified that defendant talked with him two or three times, and that he told him that she would be much better if she was in her own house, but did not think it advisable to move her in her present condition. How long this was before she left is not shown. There is no evidence to show that she might not with comparative safety have been taken to her home in a cab or hack without danger. But even if there was some danger incident to her going, there was also danger to the other occupants of the house incident upon her remaining, and it was as much the legal duty of the defendant to look out for them as to look out for her. She was able to walk and walked to the street car, made a change from one car to another, and walked two blocks to her own home. It does not appear whether she was able to hire a cab or hack, for which a very inconsiderable sum would have sufficed, or whether defendant had any information or knowledge as to her ability in this regard.

Counsel for plaintiff cite and rely upon *Depue* v. *Flatau*, 100 Minn. 299 (8 L. R. A. [N. S.] 485). The facts in that case are in no respect similar to those in this case.

In that case the plaintiff was invited into the defendants' house, and while there he was taken suddenly ill and fell to the floor. He requested permission to remain over night but defendants refused. The defendants assisted him from their house to the cutter. Plaintiff could not hold the reins to guide his team, and one of the defendants threw the reins over his shoulders and started the team upon the road. The plaintiff was in the house of the defendants by invitation. He was temporarily their guest. While the court in that case could not find an "all-four" precedent, they based their decision upon "the comprehensive principle that whenever a person is placed in such a position with regard to another that it is obvious that, if he does not use due care in his own conduct, he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself."

That decision is founded upon just and sound principles. The defendants in that case violated a legal duty towards their guest and did an active wrong when they turned him out of their house in a winter night so helpless that he could not guide his horses, and left him to his fate. The record in this case contains nothing to bring it within that.

In *Union Pacific R. Co.* v. *Cappier*, 66 Kan. 649 (69 L. R. A. 513), it is said:

"With the humane side of the question courts are not concerned. It is the omission or negligent discharge of legal duties only which come within the sphere of judicial cognizance. For withholding relief from the suffering, for failure to respond to the calls of worthy charity, or for faltering in the bestowment of brotherly love on the unfortunate, penalties are found not in the laws of men, but in that higher law, the violation of which is condemned by the voice of conscience, whose sentence of punishment for the recreant act is swift and sure."

Whatever aggravation of illness was caused in consequence of plaintiff's removal, the physicians agreed that it was due more to excitement than to any other cause. There is no evidence from which the defendant might

have inferred that such a result would follow, or that he had any intimation that the removal would excite the plaintiff, or that the excitement would aggravate her illness.

The defendant was guilty of no legal wrong, and the judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and CARPENTER, JJ., concurred.