**Susan K. GILBERTSON, Respondent,**

v.

**Richard LEININGER, et al., petitioners, Appellants.**

**No. C9–98–646.**

Supreme Court of Minnesota.

July 22, 1999.

Rehearing Denied Sept. 13, 1999.

---

William M. Hart, Katherine A. McBride, Meagher & Geer, P.L.L.P., Minneapolis, Ann Fitzgibbons, Coon, Barg, Fitzgibbons & Holman, Eden Praire, for appellants.

Donald G. Clapp, Michele M. Danielson, Clapp & Erickson, St. Paul, for respondent.

## OPINION

LANCASTER, Justice.

Respondent Susan K. Gilbertson brought this suit against appellants Richard Leininger and Jacqueline Hess, claiming that Leininger and Hess owed her a legal duty to act for her protection after she sustained a head injury while in their home. A jury found Leininger and Hess negligent, and the court of appeals affirmed the trial court's denial of their motions for judgment notwithstanding the verdict or for a new trial. Because Leininger and Hess did not have a special relationship with Gilbertson, we reverse.

On November 26, 1995, Gilbertson was a guest at the home of Leininger and Hess to celebrate the Thanksgiving holiday. The three had met at Mystic Lake Casino where they worked as blackjack dealers. Gilbertson arrived early to help Hess with

dinner preparations and planned to stay overnight. After the other guests left around 11:00 p.m., Gilbertson and Hess stayed up until 2:00 a.m. Hess gave Gilbertson a pillow and a blanket so she could sleep on the couch in the living room. Over the course of the evening, Gilbertson consumed approximately one bottle of wine and one beer.

Leininger testified that he woke up sometime during the night because Gilbertson had come into Leininger and Hess's bedroom and touched the bed. Leininger asked her "what is the matter?" and Gilbertson said "nothing." When Leininger got up the next morning, he noticed that Gilbertson was not on the couch. Instead, he found her sleeping in his nine-year-old son's bed with his son. Leininger woke Hess up, told her that he had found Gilbertson in their son's bed, and then woke the boy up to get him ready for school. Hess testified that she thought that Gilbertson had probably gotten up during the night and wandered into their son's bedroom because she had slept there on a previous occasion.

Gilbertson woke up and came downstairs around 9:00 a.m. Leininger and Hess noticed that she had some dried blood under her nose. According to Leininger, when they mentioned this to Gilbertson, she put her hand up to her nose, said "blood," and then went back upstairs. At this point, Leininger and Hess noticed that Gilbertson had both urinated and defecated in her pants. They concluded that Gilbertson was still under the influence of alcohol and decided to go out to lunch to allow her to clean herself up in private. Before leaving the house between 10:30 and 11:00 a.m., they noticed a small amount of blood on the pillow and blanket they had given Gilbertson to use, and Hess threw the soiled items into the washing machine.

Gilbertson testified that she went downstairs around 9:00 a.m., walked into the kitchen wall, and then Hess led her to the couch and told her to lie down. Gilbertson next recalls Hess pulling her up the steps by her wrists and that she bumped her head on the top of the landing.[1] Gilbertson's next memory is of a paramedic telling her that she was "going to be on a chair." Gilbertson does not have any other memories of what occurred that day.

When Leininger and Hess returned between 1:30 and 1:45 p.m., Hess checked on Gilbertson and found that she was still sleeping. Hess then took a nap and Leininger shoveled the driveway. A short time later, Hess got up from her nap and observed Gilbertson wander out of the bedroom and into a couple of other rooms before she went back into the bedroom. Around 3:00 p.m., Gilbertson came downstairs again, and Leininger and Hess noticed that she still had not cleaned herself. Leininger told Gilbertson that she "looked like hell" and that "she should look in the mirror." Hess testified that she did not think that it was odd that Gilbertson stayed in bed until late in the afternoon because she did not know when Gilbertson had stopped drinking or when she went to bed.

When Gilbertson again returned to bed without cleaning herself up, Leininger and Hess wondered whether something might be wrong. At 4:30 p.m., Hess called a nurse help line for advice. Hess told the nurse that her house guest had drunk a "jug" of wine the night before and was now disoriented, incontinent, and had dried blood on her face. Hess also told the nurse that she wanted to call the paramedics, but the nurse told Hess that she should try to stimulate Gilbertson first by cleaning her up, walking her around, and giving her caffeine. The nurse told Hess that if this did not work, she should call 911. Hess called a friend, Christine Tollefson, around 4:30 or 4:45 p.m. to help her follow the nurse's advice. When Tollefson arrived, Hess told her what the nurse had said, but after checking on Gilbertson, Tol-

---

1. Neither side maintained at trial that this bump was the cause of the head injury.

lefson disagreed and suggested that they call 911 immediately, which Hess did.

When the paramedics arrived, they determined that Gilbertson might be intoxicated because she was disoriented, incontinent, and slurred her words. The paramedics concluded that they should take her to the emergency room for further medical evaluation because intoxication can mimic other conditions, making it difficult to distinguish intoxication from a head trauma. The paramedics got permission from the staff emergency room physician, Dr. Nancy Schlehner, for an "emergency hold for a transport" because Gilbertson indicated that she did not want to go to the hospital. Paramedics typically use a transport hold when they believe it is in the person's best interest to receive further medical evaluation even though the person refuses.

Gilbertson arrived at Fairview Ridges Hospital at 6:04 p.m. and was evaluated by Dr. Schlehner who found Gilbertson to be alert, confused, and belligerent, which are symptoms consistent with many diagnoses, including intoxication. During the physical examination, Dr. Schlehner felt a fairly large bruise on the back of Gilbertson's head, and ordered a CT scan. After getting the results of the CT scan, Dr. Schlehner diagnosed Gilbertson's condition as an acute subdural hematoma and a skull fracture. Dr. Schlehner testified that a lay person would not be able to diagnose these conditions. Gilbertson was then transferred to Abbott–Northwestern Hospital, where doctors operated to remove the hematoma and reduce the swelling in her brain. According to her surgeon, Gilbertson has made a "very good recovery," but she continues to suffer residual damage from her injury.

Gilbertson brought this suit against Leininger and Hess, claiming that they should have known earlier in the day that she was seriously injured and that their delay in seeking medical assistance caused her injuries to increase in severity. After a trial in Dakota County District Court, the jury found Leininger and Hess negligent and awarded $391,800 in damages. Leininger and Hess moved for judgment notwithstanding the verdict or for a new trial. The trial court denied the motions and entered judgment. Leininger and Hess appealed to the court of appeals and the court affirmed the trial court. The court of appeals held that there was sufficient evidence for the jury to impose a legal duty on Leininger and Hess in connection with Gilbertson's injuries.

The issue before us is whether, under these circumstances, Leininger and Hess had a special relationship with Gilbertson such that they had a legal duty to act for her protection. The existence of a legal duty to protect another person presents an issue of law that we review de novo. *See Larson v. Larson,* 373 N.W.2d 287, 289 (Minn.1985). The denial of a motion for judgment notwithstanding the verdict also presents a legal question subject to de novo review. *See Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998) (citing *Diesen v. Hessburg,* 455 N.W.2d 446, 449 (Minn.1990)).

In a claim for negligence, a plaintiff must prove: (1) the defendant has a legal duty to the plaintiff to take some action; (2) there was a breach of that duty; (3) the breach of the duty was the proximate cause of the harm to the plaintiff; and (4) damage. *See Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 157 (Minn. 1982). In the absence of a legal duty, the negligence claim fails. *See id.* Leininger and Hess argue that they had no legal duty to act on behalf of Gilbertson.

A person generally has no duty to act for the protection of another person. *See Delgado v. Lohmar,* 289 N.W.2d 479, 483 (Minn.1979). The existence of a legal duty to act depends on two factors: (1) the relationship of the parties, and (2) the foreseeability of the risk involved. *See Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 168–69 (Minn.1989). Traditionally,

a special relationship giving rise to a duty to [protect] is only found on the part of common carriers, innkeepers, possessors of land who hold it open to the public, and persons who have custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection.

*Harper v. Herman*, 499 N.W.2d 472, 474 (Minn.1993) (citing Restatement (Second) of Torts § 314A (1965)). In order to find that a special relationship exists, it must be assumed that the harm to be prevented by the defendant is one that "[the defendant] is in a position to protect against and should be expected to protect against." *Erickson*, 447 N.W.2d at 168. Gilbertson contends that she had a special relationship with Leininger and Hess because they had custody of her under circumstances in which she was deprived of normal opportunities of self-protection. We disagree.

■ Leininger and Hess did not have physical custody or control of Gilbertson. Gilbertson was merely a dinner guest who happened to stay overnight. *See Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792–93 (Minn. 1995) (stating that the "duty has most often been found where an institution such as a hospital or jail has physical custody and control of the person to be protected"); *see also Harper*, 499 N.W.2d at 475 (finding no special relationship when the defendant did not hold "considerable power over [plaintiff's] welfare"). Gilberston did not entrust her health to Leininger and Hess, and Leininger and Hess did not accept the responsibility to care for Gil-

bertson's physical condition. *See H.B. By and Through Clark v. Whittemore*, 552 N.W.2d 705, 708–09 (Minn.1996) (concluding that manager of trailer park did not have a special relationship with children who were abused by another resident of the trailer park because the manager did not accept the children's entrustment); *Harper*, 499 N.W.2d at 474 (finding no special relationship when plaintiff did "not establish that [he] was either particularly vulnerable or that he lacked the ability to protect himself"); *Erickson*, 447 N.W.2d at 168 (explaining that a special relationship arises when the plaintiff has "entrusted his or her safety" to the defendant and the defendant has "accepted that entrustment").

Leininger and Hess do not have experience or training in treating medical conditions, particularly a subdural hematoma, a condition that is difficult for paramedics and doctors to diagnose because the symptoms of intoxication mimic the symptoms of a head trauma. *See Mesedahl v. St. Luke's Hosp. Ass'n*, 194 Minn. 198, 259 N.W. 819 (1935) (refusing to impose liability on a hospital for a patient's suicide because the hospital was not equipped to treat mental illnesses); *see also Depue v. Flateau*, 100 Minn. 299, 303, 111 N.W. 1, 2 (1907) (stating that "whenever a person is placed in such a position with regard to another that it is *obvious* that if he does not use due care in his own conduct, he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation") (emphasis added).[2] Leininger and Hess were not in a

2. Gilbertson argues that *Depue* compels us to conclude that Leininger and Hess owed her a legal duty to seek help earlier in the day. We disagree. In that case, Depue became ill, fainted, fell to the floor, and stumbled about the house after eating dinner with defendants. 100 Minn. at 301, 111 N.W. at 1–2. Rather than keeping Depue in their home overnight, the defendants helped him out of the house, put him into his horse-drawn cutter, placed the horses' reins over Depue's shoulders, and guided the team of horses a short distance to ensure that they took the proper path to De-

pue's home. *Id.* at 301–02, 111 N.W. at 2. Depue was found the next morning on the roadside approximately three quarters of a mile from defendants' home, nearly frozen to death. *Id.* at 302, 111 N.W. at 2. In holding that defendants had a legal duty to protect Depue, we stated that a legal duty arises only where "one of ordinary sense * * * *would at once recognize* that if he did not use ordinary care and skill * * * he would cause danger of injury to the person." *Id.* at 305, 111 N.W. at 3 (emphasis added). The facts of this case do

position to protect Gilbertson from an unknown injury and she had no reasonable expectation that they would protect her from injuring herself. *See Harper*, 499 N.W.2d at 475 (explaining in the context of a social host that, in the absence of a legal duty, negligence is not established even when the defendant has "superior knowledge of a dangerous condition"). On these facts, we conclude that Leininger and Hess did not have a special relationship with Gilbertson.

Therefore, we hold that Leininger and Hess did not have a legal duty to protect Gilbertson from harm when, unbeknownst to Leininger and Hess, she sustained a head injury after an evening of drinking and then behaved in a manner that was consistent with multiple diagnoses, including intoxication.

Reversed.

not give rise to a similar legal duty. Leininger and Hess did not affirmatively place Gilbertson in danger, and neither the help line nurse nor the paramedics were able to determine whether Gilbertson was injured or merely intoxicated because her symptoms were consistent with either diagnosis. Thus, *Depue* is not dispositive.