# FOR PUBLICATION



**FILED**

Jul 31 2012, 8:50 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**J. DAVID HOLLINGSWORTH**
**ALEXANDER P. PINEGAR**
Church, Church, Hittle & Antrim
Fishers, Indiana

ATTORNEYS FOR APPELLEES:

**RICHARD R. SKILES**
**A. KRISTINE LINDLEY**
Skiles Detrude
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

THE ESTATE OF K. DAVID SHORT )
BY JUDITH Y. SHORT, PERSONAL )
REPRESENTATIVE, )
                                  )
    Appellant-Plaintiff, )
                                  )
      vs. )    No. 49A02-1112-CT-1128
                                  )
BROOKVILLE CROSSING 4060 LLC )
d/b/a BAYMONT INNS & SUITES and )
MPH HOTELS, INC. d/b/a BAYMONT )
INNS & SUITES, )
                                  )
    Appellees-Defendants. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-0911-CT-52090

**July 31, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Judith Short, as personal representative of the estate of David Short (the "Estate"), appeals the trial court's grant of summary judgment in favor of Brookville Crossing 4060 LLC d/b/a Baymont Inns & Suites and MPH Hotels, Inc. d/b/a Baymont Inns & Suites ("Baymont"). The Estate raises five issues which we revise and restate as whether the court erred in granting Baymont's motion for summary judgment. We affirm.

The relevant facts as designated by the parties follow. On the evening of January 3, 2009, at around 10:20 p.m., David Short checked into the Baymont Inn & Suites in Indianapolis, Indiana (the "Hotel") with front desk clerk Laura Sentman. During check in, Short did not act peculiar in any way.

That evening and into the morning of January 4, 2009, between the hours of 11 p.m. and 7 a.m., night auditor Seth Devine was the only Baymont employee on duty. Devine was aware that the temperature that evening was below freezing. At around 11:15 p.m., Devine received a call from a guest at the Hotel complaining of noise coming from Short's room, Devine went to the room and knocked, and after receiving no response he entered, observed that no one was present, and turned down the television in the room. Upon leaving the room, Devine observed Short entering the building through a side door located on the north side of the building and briefly spoke with him.

At some point, unbeknownst to Devine, Short again left the Hotel. A video camera located at the north door documented that, at approximately 3:20 a.m., Short was returning to the Hotel when he appeared to fumble with his key-card at the door, and, at 3:23 a.m., he collapsed, hitting his head against a wall before falling to the ground. The camera was part of a system in which a monitor was located in the general manager's

2

office which displayed images from each of sixteen video cameras. The general manager's office is adjacent to the front desk. After falling, Short was visible on the camera and did not move.

At approximately 7 a.m., Gustavo Martinez, a Baymont maintenance employee, noticed Short lying outside the north door as he was driving around the corner of the Hotel and called the front desk, notifying General Manager Debbie Speziale, who had recently arrived and had walked in through the Hotel's main entrance. Speziale and Devine proceeded to the north door and observed Short lying outside the door, and Speziale called 911 while Devine exited out another door and walked around the Hotel and back to the north door because he could not open the door due to Short lying in front of it. Devine checked for a pulse but was unable to locate one, and he observed that Short was purple and appeared to be dead. Ultimately, the Marion County Health Department pronounced Short dead at 7:38 a.m. from "Complications of acute alcohol intoxication and atherosclerotic coronary artery disease" and noted that "Environmental Cold Exposure" was a "Significant Condition[] Contributing To Death But Not Resulting In The Underlying Cause . . . ." Appellant's Appendix at 89.

On November 13, 2009, the Estate filed a complaint for damages as a result of wrongful death and request for trial by jury alleging negligence by Baymont which caused Short's death. On February 2, 2010, Baymont filed its answer. On June 18, 2010, Devine was deposed in which he testified that, during his shift, he does not walk around the building to make routine or periodic inspections of the exterior doors not visible from the front desk and that he is to stay at the main entrance because that is where

3

unregistered guests must enter and it is a danger to have the desk unmonitored during overnight hours. Devine also testified that he will make observations if there is a reason to leave the front desk, such as if a guest requests something, but that "if there's no need for me to be away from the desk, there's no possibility for me to be able to check those doors . . . ." Id. at 67. Devine testified that he examines the exterior of the building and the doors when he arrives for his shift by driving around the building and makes notes necessary for the day shift or maintenance workers about issues he identifies, and he will again look at the Hotel's exterior when he leaves in the morning. Devine testified that he had been told that the purpose of the video monitoring system was to deter potential crime and to record crimes committed to aid police investigation, and that the system also was equipped with a "panic system" which allows the Hotel to immediately notify the police if a crime has been committed. Id. at 66.

Devine testified that, on the night in question, he did not receive requests from guests near the north door after the incident in which he let himself into Short's room to turn down the television. He testified that during his shift that evening, he passed through the general manager's office on three occasions while on his way to other areas of the Hotel, that two of those occasions were after Short had collapsed, and that on each occasion he glanced at the video monitor which was located about ten to twelve feet from him as he passed. The monitor, which was a nineteen-inch screen, displayed sixteen images at once, and the only image large enough for Devine to see at that distance was the image of the main entrance and not the north door. Devine testified that he did not notice Short at any time between 3:20 a.m. and 7:00 a.m. on the monitor either walking to

4

the hotel across the parking lot or collapsing and lying near the north door. Devine testified that he reviewed the video showing Short's body and found that there was no activity at the north door following the fall until 7 a.m.

Further, on October 4, 2010, Sentman was deposed in which she testified that she does not discuss the security system when guests check in and that, if they ask, she tells guests that "there's cameras that record the inside exits." Id. at 41. Sentman testified that she has experience working the night audit shift and that she had been instructed while working that shift "to stay in the front desk or lobby area as much as possible" and to not leave the front desk "unless you absolutely have to," such as for two or three minutes to "run a towel up to a guest room" or use the restroom. Id. at 42. She also testified that she smokes and will smoke "[r]ight outside the lobby" where she can observe the front desk. Id.

Also on October 4, 2010, Speziale was deposed in which she testified that her employees perhaps checked the video monitor one or two times during their shift and that there was no rule about employees checking the monitor. Speziale testified that Baymont had an unwritten rule that the night auditor should not be away from the front desk for more than two minutes if possible. She also testified that in order to see the video monitor clearly, one needed to be about three or four feet away from it. She testified that the Baymont had an employee handbook, that employees were required to sign an acknowledgement that they had received the handbook, and that Devine signed for his copy of the handbook. She also testified that the Hotel had never had an issue of a vagrant in a doorway.

5

On September 2, 2011, Baymont filed a motion for summary judgment along with a memorandum in support and designation of evidence. On November 4, 2011, the Estate filed a response and designation of evidence in support of response to Baymont's summary judgment motion, as well as a memorandum in support of its response. On November 29, 2011, the court held a hearing on Baymont's summary judgment motion in which Baymont's counsel noted at the hearing that "[t]here was no snow or any weather condition that would put us on notice that there could have been an issue that night" and that "Short simply fell over due to his own problem . . . ." Transcript at 3. The Estate argued at the hearing, among other things, that Baymont imposed a duty on itself in its employee handbook in that it required employees to keep the doorways clear. That same day, the court granted Baymont's motion, finding that "there are no genuine issues of material fact precluding the entry of summary judgment in this case . . . ." Appellant's Appendix at 6. This appeal follows.

The issue is whether the court erred in granting Baymont's motion for summary judgment. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold ex rel. Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Id. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by

6

the Indiana Trial Rule 56 materials. Catt v. Bd. of Comm'rs of Knox Cnty., 779 N.E.2d 1, 3 (Ind. 2002).

A party moving for summary judgment bears the initial burden of showing no genuine issue of material fact and the appropriateness of judgment as a matter of law. Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 975 (Ind. 2005). If the movant fails to make this prima facie showing, then summary judgment is precluded regardless of whether the non-movant designates facts and evidence in response to the movant's motion. Id.

This action sounds in negligence and specifically concerns the duty element in a negligence claim.[1] "Generally, whether a duty exists is a question of law for the court to decide." Rhodes v. Wright, 805 N.E.2d 382, 386 (Ind. 2004) (citing Hooks SuperX, Inc. v. McLaughlin, 642 N.E.2d 514, 517 (Ind. 1994)). "However, if factual questions are interwoven, the existence of a duty may be a mixed question of law and fact appropriate for determination by a jury." Griffin v. Simpson, 948 N.E.2d 354, 357 (Ind. Ct. App. 2011), trans. denied; see also Douglass v. Irvin, 549 N.E.2d 368, 369 n.1 (Ind. 1990) ("While it is clear that the trial court must determine if an existing relationship gives rise to a duty, it must also be noted that a factual question may be interwoven with the determination of the existence of a relationship, thus making the ultimate existence of a duty a mixed question of law and fact.") (quoting Clyde E. Williams & Assocs. v.

---

[1] The tort of negligence is comprised of three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a breach of duty, that is, a failure on the part of the defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure. Douglass v. Irvin, 549 N.E.2d 368, 369 (Ind. 1990).

Boatman, 176 Ind. App. 430, 435, 375 N.E.2d 1138, 1141 (1978)). To determine whether a duty exists, we must balance three factors: "(1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns." Baker v. Fenneman & Brown Properties, LLC, 793 N.E.2d 1203, 1206 (Ind. Ct. App. 2003); see also Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991), reh'g denied. However, this balancing test is a useful tool to determine whether a duty exists "only in those instances where the element of duty has not already been declared or otherwise articulated."[2] N. Ind. Pub. Serv. Co. v. Sharp, 790 N.E.2d 462, 465 (Ind. 2003). "Absent a duty there can be no negligence or liability based upon the breach." Kroger Co. v. Plonski, 930 N.E.2d 1, 6 (Ind. 2010) (citing Peters v. Forster, 804 N.E.2d 736, 738 (Ind. 2004)).

"It is well-settled that, '[a]s a general rule, an individual does not have a duty to aid or protect another person, even if he knows that person needs assistance.'" A.S. v. LaPorte Reg'l Health Sys., Inc., 921 N.E.2d 853, 860 (Ind. Ct. App. 2010) (quoting Baker, 793 N.E.2d at 1206 (citing L.S. Ayres v. Hicks, 220 Ind. 86, 93, 40 N.E.2d 334, 337 (1942), reh'g denied with opinion, 220 Ind. 86, 41 N.E.2d 195 (1942))). As noted in Baker, however, there are exceptions to this general rule and among them is a duty which

---

[2] We note that recently, two members of the Indiana Supreme Court have questioned the usefulness of the Webb framework in that the "foreseeability" factor, which, as Chief Justice Dickson described, was "traditional but redundant," is factored into the analysis for both duty and proximate cause. Caesars Riverboat Casino, LLC v. Kephart, 934 N.E.2d 1120, 1126 (Ind. 2010) (Dickson, J., dissenting); see also id. at 1125-1126 ("My specific complaint about Webb is that it identifies 'foreseeability' as one of the three factors the courts are to evaluate in deciding whether the defendant has a duty to the plaintiff. . . . I have tried to spell out some of the pernicious consequences of this confusion in Theodore R. Boehm, *A Tangled Webb—Reexamining the Role of Duty in Indiana Negligence Law*, 37 Ind. L. Rev. 1 (2003).") (Boehm, J., concurring in result).

arises from certain special relationships between the parties, described by § 314A of the Restatement (Second) of Torts as follows:

> § 314A.  Special Relations Giving Rise to Duty to Aid or Protect
>
> 1)  A common carrier is under a duty to its passengers to take reasonable action:
>
>     (a)  to protect them against unreasonable risk of physical harm, and
>
>     (b)  *to give them first aid after it knows or has reason to know that they are ill or injured*, and to care for them until they can be cared for by others.
>
> (2)  *An innkeeper is under a similar duty to his guests.*
>
> (3)  A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4)  One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Baker, 793 N.E.2d at 1207 (quoting RESTATEMENT (SECOND) OF TORTS § 314A (1965)) (emphases added).

The Estate argues that the three-part Webb balancing test supports the existence of a duty on Baymont to protect Short in this instance.  First, regarding the relationship between the parties, the Estate argues that "[a] duty exists in this case by virtue of the hotel-guest relationship" and that "the duty's contours were in this factual context and whether the duty was breached are questions for the jury to decide."  Appellant's Brief at 14.  The Estate argues that "the designated evidence creates issues of fact concerning whether the Baymont should have known of Short's peril" and thus summary judgment

9

was not appropriate. Id. at 15. The Estate argues that Baymont should have known that Short was in danger because it "had a clear policy, which Devine the night auditor was aware of but essentially ignored, requiring all hotel exits to be kept clear" and that, had he taken steps to insure that the north door exit was clear he would have discovered Short.[3] Id. at 20.

The Estate argues that Devine could have checked the north door in a number of ways. First, the Estate designated evidence indicating that walking from the front desk to the doorway and back takes one minute and thirty-nine seconds which is less than the unwritten rule that the night auditor should not be away from the front desk for more than two minutes. On that score, the Estate argues that the unwritten rule is "riddled with

---

[3] The Estate makes a related argument in another section of its brief and without citation to authority that, independent of the analysis under Webb or § 314A, Baymont had a self-imposed duty "based upon its own safety and security policies," noting that the "employee handbook stated without any equivocation that employees were required to keep all exits clear." Appellant's Brief at 13 (citing Appellant's Appendix at 121). The Estate argues that "[t]here can be no dispute that the door at which Short fell was an exit from the Baymont," that "[f]or more than three and one half hours the doorway was not clear," and that "[h]ad Devine taken minimal steps – looking at the monitor or walking to the doorway – he would have fulfilled his obligation to keep the doorways clear" and would have discovered Short. Id.

The Baymont employee manual states that "[t]he safety and security of employees as well as guests is extremely important," that "[y]ou must work carefully at all times to ensure your own safety as well as that of others," and that "[a]mong the things you must do are: . . . 3. Be sure that all exits are kept clear." Appellant's Appendix at 121. However, even if the employee handbook established such a duty (in which Baymont cites case law to the contrary), the Estate's argument would fail on proximate cause. This court has recently addressed proximate cause in negligence actions, stating:

> [w]hether an act is the proximate cause of an injury depends upon whether the injury was a natural and probable consequence of the negligent act which, in light of the attending circumstances, could have been reasonably foreseen or anticipated. The negligent act *must set in motion* the chain of circumstances which contribute to or cause the resulting injury.

Key v. Hamilton, 963 N.E.2d 573, 584 (Ind. Ct. App. 2012) (quoting Humphery v. Duke Energy Ind., Inc., 916 N.E.2d 287, 292 (Ind. Ct. App. 2009)) (emphasis added). Simply, any failure on Baymont's part to keep the north door exit clear did not set in motion circumstances causing or contributing to Short's death, nor was Short's death, which was caused by a medical condition and exacerbated by his exposure to the cold, a natural and probable consequence of any such failure.

exceptions" because Devine "would routinely leave the front desk to prepare breakfast, wash laundry, fulfill guests' requests, enter the general manager's office to pick up paperwork, and smoke cigarettes." Id. at 21. Next, the Estate argues that Devine "could have more carefully examined the video monitor, which would merely have required him to walk into the general manager's office and walk up to a 19 inch monitor" and "would have taken him approximately 10 seconds . . . ." Id. at 20. The Estate argues that "Devine admitted that he 'glanced' at the video monitor on at least two occasions subsequent to Short's fall and three occasions during his shift" which "raises the question: why would he even 'glance' at the monitor if it is not used for monitoring the hotel's premises" and was merely for recording purposes as argued by Baymont at the summary judgment hearing. Id. at 22.

Regarding the other Webb factors, the Estate argues that "Short's ultimate injury was obviously foreseeable," noting that "the appropriate question is not whether [] Baymont could foresee Short's fall, but rather, could [] Baymont foresee that Short would suffer grave injuries *after* he fell." Id. at 23. The Estate argues that "[a]s discussed above, considerable evidence raises at the very least a question of fact concerning whether the Baymont had reason to know of Short's peril." Id. The Estate also argues public policy supports that a duty should be imposed in this situation because "[s]ocial policy dictates that the storeowner, who is deriving this economic benefit from the presence of the customer, should assume the affirmative duty [to help customers who become ill as] a cost of doing business." Id. at 24 (quoting Baker, 793 N.E.2d at 1209). The Estate argues that while true imposing a duty can "deter individuals from taking

11

responsibility for their actions, it cannot be the law of this case that a premises owner should *avoid* using the resources at its disposal to occasionally check on the safety of its guests." Id. at 25.

Baymont argues that "Indiana law governing the duty owed by an innkeeper to its guest[s] is clearly established." Appellees' Brief at 8. Baymont's assertion is that "the Estate's argument misses the distinction between what the Estate maintains Baymont *should have done* to discover Short (and whether Baymont had a duty to do so) and what the Estate maintains Baymont *should have known*, had it taken the actions the Estate argues it should have (which goes to breach)." Id. at 9. Regarding the Estate's argument that Baymont owed Short a duty by virtue of his being a hotel guest, Baymont notes that the Estate's citation to authority for this proposition is as to premises liability, specifically Section 343 of the Restatement (Second) of Torts; however, Short did not slip and fall or was otherwise injured by a condition of the land and thus, "Baymont's duty to Short is not defined by the requirements of §343 of the Restatement, but rather defined by §314A . . . ." Id. at 13.

Regarding § 314A, Baymont argues that it did not have "actual knowledge of [Short's] presence at the back door or his need for assistance until 7:00 a.m. . . . at which time it immediately responded," that "[t]he only other way [it] could owe Short a duty under §314A is if it had reason to know of his predicament prior to that time," and that "[t]he only way [it] could have known of Short's predicament is if it had a legal duty to monitor the video camera system or patrol the hallways on the off chance it might discover guests who had fallen ill and needed assistance." Id. at 13-14. Baymont

12

mentions that "[t]his premise is without any support in Indiana law," and as such it "had no 'reason to know' of Short's predicament until shortly after 7 a.m. on January 4, 2009." Id. at 15. Baymont also argues that "Short's collapse, which is the event that led to his death, was not foreseeable" and thus "Baymont had no reason or duty to anticipate his collapse or that he might need help in the middle of the night." Id. at 17. Baymont argues that public policy weighs against imposing a duty because the camera system was intended to deter crime and arguably increases the safety of guests and employees, and "[a] ruling that premises owners who install camera systems must also continuously or routinely observe the monitors to detect invitees who experience sudden medical emergencies would have a deterrent effect on the installation of such systems . . . ."[4] Id. at 18.

As noted in Baker, liability based upon § 314A is not limited "to situations where the plaintiff was an invitee *and* the instrumentality causing the injury belonged to the defendant." 793 N.E.2d at 1208. Indeed, the duty imposed explicitly "extends to cases where the illness or injury is due to natural causes, to pure accident, to the acts of third person, or to the negligence of the plaintiff himself . . . ." Id. (quoting RESTATEMENT § 314A cmt. d). However, as highlighted by Baymont in its arguments, an innkeeper has a duty to its guests to provide first aid only after it knows or has reason to know that they

---

[4] The Estate argues in its reply brief that "the designated evidence raises at least an inference upon which a jury could find that the Baymont" had actual knowledge of Short's peril which should defeat summary judgment because Devine could have been "untruthful in whether or not he saw Mr. Short's body." Reply Brief at 6. However, the Estate has not designated evidence bringing Devine's credibility into question, and on summary judgment only "reasonable" inferences are to be construed in favor of the nonmovant. Also, the Estate, in paragraph 11 of its complaint, averred that Short's body "was not found or otherwise discovered by an employee of the Baymont until approximately 7:00 AM on January 4, 2009." Appellant's Appendix at 38.

13

are ill or injured. Thus, this case turns on whether Baymont had reason to know between the hours of 3:20 a.m. and 7 a.m. that Short was in peril after collapsing outside the north door.

According to the Restatement, "[t]he duty in each case is only one to exercise reasonable care under the circumstances," and the defendant "is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury" and "is not required . . . to give aid to one whom he has no reason to know to be ill." RESTATEMENT § 314A cmt. e. Also, the exception applies "only where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation" such that "[a] carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises." Id. at cmt. c; but see Kellner v. Lowney, 145 N.H. 195, 761 A.2d 421 (2000) (holding motel owner could be liable for injury to boy crossing public highway between two portions of motel property because owner should have foreseen the risk to his guests of crossing the highway to get from hotel rooms to portion of hotel property where religious services were held).

Here, the bases cited by the Estate as to why it should have known of Short's peril are that it was a short walk for Devine, the night auditor, to leave the front desk and check the door, and that if Devine had examined the video monitor in the general manager's office he would have viewed Short lying on the ground outside of the door. Regarding the first basis, we note that the designated evidence reveals that Devine was supposed to stay at the main entrance because it was a danger to have the front desk

14

unmonitored during overnight hours, that he examines the exterior of the building when he arrives and leaves during his shift, that he will make observations of other parts of the Hotel including the north door if he has an independent reason to be in that part of the building, and that on the night in question, following the incident in which he entered Short's room earlier in the evening to turn down Short's television, he had no other requests which required him to travel to the north side of the building. Thus, routine door checks were not within the scope of Devine's nightly duties such that he should have known of Short's peril. To the extent that the Estate suggests that the claim Devine is to stay at the front desk is "riddled with exceptions" because he testified that he "routinely leave[s] the front desk to prepare breakfast, wash laundry, fulfill guests' requests, enter the general manager's office to pick up paperwork, and smoke cigarettes," Appellant's Brief at 21, we note that with the exception of fulfilling guest requests which was addressed above, these other incidents are located in the vicinity of the front desk. Also, to the extent that the Estate suggests that Devine ignored the company policy to keep the hotel exits clear, we note that it is unclear at best that the policy required Devine to proactively seek out obstructions during his shift, and that, in any event, any supposed failure on Devine's part to comply with this policy cannot result in liability on Baymont's part under § 314A. See note 3, *supra*.

As to the second basis, the Estate claims that because Short's peril was captured on the Hotel's video monitoring system, had Devine "more carefully examined the video monitor" in the general manager's office, located next to the front desk, he would have discovered Short. Appellant's Brief at 20. The designated evidence reveals that Devine

had been told that the purpose of the video monitoring system was to deter potential crime and to record crimes committed to aid police investigation, that it was equipped with a panic system function to immediately notify police of a crime, that Devine passed through the general manager's office twice following Short's collapse, and that on each occasion he glanced at the video monitor. The video monitor was located about ten to twelve feet from Devine when he would pass through the office. The monitor was a nineteen inch screen, displayed sixteen images at once, and the image of the main entrance was larger than the others such that it was the only image large enough for Devine to see at that distance as he glanced at it. Also Sentman, who was present when Short checked in, testified that she does not inform guests of the video monitoring system and if guests ask she tells guests that "there's cameras that record the inside exits." Appellant's Appendix at 41. Speziale, the general manager and Devine's boss, testified that there was not a rule requiring employees to check the video monitor and that in order to see the video monitor clearly, one needed to be about three or four feet away from it. Thus, the fact that Short's body was visible on the video monitor screen was not sufficient to alert Baymont and specifically Devine of Short's peril.

Indeed, this case is unlike Baker and the cases to which it cites in that the situation of Short's peril had not been presented to Devine, who was the only employee working during the hours in question, in any significant way such that he should have recognized the perilous situation. See Baker, 793 N.E.2d at 1205 (plaintiff, while at the counter of the business, "suddenly fell backward" in which his "head hit the floor, and he was knocked unconscious and began having convulsions"); see also Gingeleskie v. Westin

16

Hotel, et al., 145 F.3d 1337, 1998 WL 279393 at *2 (9th Cir. 1988) (holding question of fact existed regarding whether hotel took reasonable steps under § 314A to get a sick man to a hospital when the employee called a cab rather than an ambulance); Southland Corp. v. Griffith, 332 Md. 704, 633 A.2d 84, 91-92 (1993) (holding business had a duty to provide aid to injured customer by calling the police when a customer requested the employee do so); Hovermale v. Berkeley Springs Moose Lodge No. 1483, 165 W.Va. 689, 690-691, 271 S.E.2d 335, 337-340 (1980) (holding that owner owed a duty under § 314A to decedent who while having a drink and standing at the bar collapsed to the floor, and one of the bartenders on duty instructed other patrons "take him out to his car to 'sleep it off,'" and the decedent was discovered the next day still in his vehicle having died of a heart attack "sometime within two to five hours after being placed in the vehicle"); Depue v. Flatau, 100 Minn. 299, 301-302 111 N.W. 1, 1-2 (1907) (homeowner held liable for aggravating the injuries of a businessman whom homeowner sent away unattended on a cold winter night after the businessman felt severely ill and fainted); Miller v. McDonald's Corp., 439 So.2d 561, 565 (La. Ct. App. 1983) (holding business owner had duty to render reasonable aid after learning person on his premises is injured or ill and remanding to allow plaintiff to amend his complaint to so allege), writ not considered 442 So.2d 462 (La. 1983); Estate of Starling v. Fisherman's Pier, Inc., 401 So.2d 1136, 1136-1138 (Fla. Dist. Ct. App. 1981) (holding that question of fact existed regarding owner's duty owed to a "passed-out drunk customer" who was left lying near the ocean on a pier and was ignored and who subsequently fell from the pier and drowned), rev. denied 411 So.2d 381 (Fla. 1981); Lloyd v. S.S. Kresge Co., d/b/a K-

17

Mart, 85 Wis.2d 296, 298-299, 303-305, 270 N.W.2d 423, 424, 426-427 (Wis. Ct. App. 1978) (holding question of fact existed regarding whether K-Mart failed to give reasonable assistance to customer who was ill when it forced her to wait for her ride outside the store on a cold winter night after she informed store personnel that "she was not feeling well and was running a temperature" and "that if she went outside to wait, there was a possibility she would be chilled to the bone and become seriously ill").

The rule advocated by the Estate would have the effect of expanding the scope of the "have reason to know" element of § 314A to instances in which the owner did not have knowledge of the situation of peril, rather than instances currently within its scope in which the owner knew of the situation but failed to recognize the peril that attached. See L.S. Ayres, 220 Ind. at 95-96, 40 N.E.2d at 338 (noting that the measure of the duty is "not unlike that imposed by the rule of the last clear chance or doctrine of discovered peril," in which "the defendant must have had knowledge of the plaintiff's situation of peril . . ."). We conclude that Baymont did not have reason to know of Short's peril and thus the court did not err in granting its motion for summary judgment. See McCann v. Miller, No. 08-561, 2009 WL 4641713, at **1, 3, 6 (E.D. Pa. Dec. 7, 2009) (holding that hotel was entitled to summary judgment against plaintiff hotel guests where the plaintiffs were assaulted while on hotel property and the question was whether, under § 314A, the hotel "had reason to know that the assault was going to occur").

For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of Baymont.

Affirmed.

18

BAKER, J., and KIRSCH, J., concur.